MATTER OF DUNAR

In Deportation Proceedings

A–14616395

*Decided by Board April 17, 1973*

(1) The provisions of Article 32 of the United Nations Convention of July 28, 1951, which became binding on the United States when it adhered to the 1967 Protocol Relating to the Status of Refugees, do not preclude the deportation of an alien refugee who entered the United States lawfully as a nonimmigrant and has remained in this country unlawfully.

(2) The provisions of Article 33 of the United National Convention of 1951, *supra*, have effected no substantial changes in the application of section 243(h) of the Immigration and Nationality Act, either by way of burden of proof, coverage, or manner of arriving at decisions.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Nonimmigrant— remained longer.

ON BEHALF OF RESPONDENT:
Donald L. Ungar, Esquire
517 Washington Street
San Francisco, California 94111
(Brief filed)

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney
(Brief filed)

This is an appeal from an order of an immigration judge[1] finding the respondent deportable, denying his request for termination of the proceedings, denying his application for withholding of deportation under section 243(h) of the Immigration and Nationality Act, and directing his deportation to Hungary. For the reasons stated below, we remand for further proceedings.

Respondent is a 32-year-old male alien, a native and citizen of Hungary, who was admitted to the United States on January 18, 1966 as a nonimmigrant visitor and remained longer than permitted. At a hearing before the immigration judge, at which he was represented by present counsel, respondent admitted the truth of

---

[1] While this case was pending before us on appeal, the titles of special inquiry officers were changed administatively to immigration judges, 8 CFR 1.1(1), 38 FR 8590 (April 4, 1973).

the factual allegations of the order to show cause, conceded deportability, designated England as the country of deportation, and requested withholding of deportation to Hungary, the alternate country of deportation if England should refuse him, under section 243(h) of the Immigration and Nationality Act. At a continued hearing, counsel withdrew the concession of deportability and asked that the proceedings be terminated. He contended that, as a refugee who had lawfully entered the United States as a nonimmigrant, respondent was immunized from deportation under Article 32 of the 1951 United Nations Convention Relating to the Status of Refugees, which became binding on the United States when it adhered to the 1967 Protocol Relating to the Status of Refugees, TIAS 6577, 19 U.S. Treaties (Part 5, 1968) 6223, which entered into force with respect to the United States on November 1, 1968.

So far as we are aware, the question is novel. While the Convention and Protocol have been mentioned by the courts in a few immigration cases, nothing has been stated in the opinions which is helpful to us here. See, e.g., *INS* v. *Stanisic*, 395 U.S. 62, 79–80 fn. 22; *Muskardin* v. *INS*, 415 F.2d 865, 867 (C.A. 2, 1969).

The first question confronting us is whether respondent has achieved a nondeportable status, as claimed. If he is not deportable in the first place, we need not reach the other issues raised with respect to his application for temporary withholding of deportation. A brief analysis of the pertinent statutory and other provisions involved will furnish a meaningful backdrop to the question.

Preliminarily, the statute sets up a distinction between aliens who are admitted for permanent residence as immigrants and those who, like the respondent, come here for a temporary stay as nonimmigrants. Aliens seeking admission for permanent residence must, unless exempted, meet specific numerical limitations and labor certification requirements not normally prescribed for nonimmigrants. The latter (consisting of temporary visitors for business or pleasure, students, crewmen, aliens in transit through the United States, and the like) are expected to remain here only temporarily. They are not generally subject to the numerical and other limitations so carefully prescribed by Congress for intending immigrants who, once admitted for permanent residence, are free to remain indefinitely and to compete with American labor for available jobs.

Section 241(a) of the Act defines the classes of aliens in the United States who are subject to deportation. Sections 241(a)(1), (2) and (10) decree deportation based on the alien's inadmissibility at the time of entry or because of the manner of entry. Section

311

241(a)(2) also calls for the deportation of an alien who "is in the United States in violation of this Act;" this has been held to encompass aliens who, like respondent, entered lawfully as nonimmigrants and remained here after their period of temporary stay had expired. Section 241(a)(9) provides for the deportation of aliens who entered lawfully as nonimmigrants and thereafter failed to maintain their nonimmigrant status or to comply with the conditions of admission. All the other numerous grounds for deportation in section 241(a) are based on the alien's post-entry conduct and apply with full force to aliens who had originally been lawfully admitted for permanent residence.

The Act does not, in terms, define "refugees" or provide for their "asylum" in the United States. Deportable aliens who, like respondent, claim they would be subject to persecution if sent to a given country, are covered by section 243(h) of the Act, as amended:

> The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.

Article 1 of the United Nations 1951 Convention Relating to the Status of Refugees, to which the United States did not originally adhere, in partinent part defined a refugee as a person who, as a result of events occurring before January 1, 1951,

> ... owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.[2]

Article 32 of the Convention, relating to "Expulsion," provides as follows:[3]

> 1. The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.
>
> 2. The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, the refugee shall be allowed to submit evidence to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority.
>
> 3. The Contracting States shall allow such a refugee a reasonable period within which to seek legal admission into another country. The Contracting States reserve the right to apply during that period such internal measures as they may deem necessary.

---

[2] S. Exec. K, 90th Cong., 2d Sess., at 1, 5, 6.

[3] S. Exec. K, 90th Cong., 2d Sess., at 15.

Article 33 of the Convention is as follows:[4]

*Prohibition of Expulsion or Return ("Refoulement")*

1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

The major objective of the Protocol was to make the Convention applicable to all refugees covered by its definition irrespective of the January 1, 1951 deadline, and this was accomplished in Article I of the Protocol. In acceding to the Protocol, the United States undertook to apply Articles 2 to 34, inclusive, of the Convention to refugees as defined in the Protocol.[5]

Since it supplements and incorporates the substantive provisions of the Convention, the Protocol must be regarded as a treaty,[6] which is part of the supreme law of the land, United States Constitution, Article VI, Cl. 2. Such a treaty, being self-executing, has the force and effect of an act of Congress, *Valentine v. United States*, 299 U.S. 5, 10 (1936). Neither the Convention nor the Protocol in terms refers to section 241(a), 243(h) or any other pertinent provision of our immigration laws. The precise question confronting us is whether those provisions have been affected by the later treaty provisions and if so, in what way.

Certain well-settled principles apply in determining whether a treaty has repealed or modified a previously enacted statute. A self-executing treaty supersedes a prior Congressional enactment if the act is inconsistent with the terms of the treaty, *Cook v. United States*, 288 U.S. 102, 118 (1933). The purpose of a treaty to supersede an act of Congress, in whole or in part, may not be lightly assumed, however. Such a purpose must appear clearly and distinctly from the words used in the treaty, *United States v. Lee Yen Tai*, 185 U.S. 213, 221 (1902). When a statute and a treaty relate to the same subject, an attempt must be made to give effect to both, if that can be done without violating the language of either. If the two are inconsistent, the one of later date will control the other, provided that the stipulation of the treaty on the subject is self-executing, *Whitney v. Robertson*, 124 U.S. 190, 194

---

[4] S. Exec. K, 90th Cong., 2d Sess., at 15.

[5] S. Exec. K, 90th Cong., 2d Sess., at 1.

[6] S. Exec. Rept. No. 14, 90th Cong., 2d Sess., at 8–9.

(1888). Repeals by implication are never favored, and a later treaty will not be regarded as repealing an earlier enactment by implication unless the two are absolutely incompatible and the later one cannot be enforced without antagonizing the earlier, *Johnson* v. *Browne*, 205 U.S. 309, 321 (1907).

Our examination of the legislative materials satisfies us that the United States Senate, in giving its advice and consent to accession to the Protocol, did not contemplate that radical changes in existing immigration laws would be effected. Quite the contrary, the general representations made to induce affirmative Senate action indicated that our immigration laws already embodied the humane provisions for refugees fostered by the Convention and Protocol. Accession by the United States, it was asserted, would lend the weight of our moral support to the measure and would influence other nations with less liberal refugee legislation to adhere to it.

Thus, in submitting the Protocol to the President, the Secretary of State informed him that, "United States accession to the Protocol would not impinge adversely upon the laws of this country."[7] The Secretary further stated:[8]

> Accession to the Protocol would promote our foreign policy interests through reaffirming, in readily understandable terms, our traditional humanitarian concerns and leadership in this field. It would also convey to the world our sympathy and firm support in behalf of those fleeing persecution. Actually, most refugees in the United States already enjoy legal and political rights which are equivalent to those which states acceding to the Convention or the Protocol are committed to extend to refugees within their territories ...

In his message to the Senate, transmitting the Protocol and accompanying State Department report, the President stated:[9]

> It is decidedly in the interest of the United States to promote this United Nations effort to broaden the extension of asylum and status for those fleeing persecution. Given the American heritage of concern for the homeless and persecuted, and our traditional role of leadership in promoting assistance for refugees, accession by the United States to the Protocol would lend conspicuous support to the effort of the United Nations toward attaining the Protocol's objectives everywhere. This impetus would be enhanced by the fact that most refugees in this country already enjoy the protection and rights which the Protocol seeks to secure for refugees in all countries. Thus, United States accession should help advance acceptance of the Protocol and observance of its humane standards by States in which, presently, guarantees and practices relating to protection and other rights for refugees are less liberal than in our own country.

Similar views were expressed by State Department officials in statements and testimony before the Senate Committee on For-

[7] S. Exec. K, 90th Cong., 2d Sess. at VII.
[8] S. Exec. K, 90th Cong., 2d Sess. at VIII.
[9] S. Exec. K, 90th Cong., 2d Sess. at III.

eign Relations. See, *e.g.*, the statement of Laurence A. Dawson, Acting Deputy Director, Office of Refugee and Migration Affairs:[10]

... [The President] has pointed out that since refugees in this country already enjoy the protection and rights which the Protocol seeks to secure everywhere, United States accession should help to advance the Protocol and acceptance of its humane standards in other states whose treatment of refugees is less liberal ... Even though the United States already meets the standards of the Protocol, formal accession would greatly facilitate our continuing diplomatic effort to promote higher standards of treatment for refugees and more generous practices on the part of countries whose approach to refugees is less liberal than our own.

Mr. Dawson further testified:[11]

Now, it is more important, in this growing spectrum of unrest, the emergence of new nations and proliferation of refugee problems, to project our image and use our image and use our influence. We believe that our accession would help to support this United Nations effort to extend throughout the world the concept of protection for refugees and the furnishing of rights to them such as we have always done within our national tradition in this country.

Our immigration laws already contain certain provisions whereby aliens unlawfully in the United States, whether refugees or not, may achieve lawful permanent resident status by administrative action. See, *e.g.*, sections 244(a), 245 and 249 of the Immigration and Nationality Act. Section 203(a)(7) of the Act sets up preferences for certain refugees in obtaining conditional entry from abroad and in achieving permanent resident status. If we accepted respondent's view, all these, as well as the deportation provisions of section 241(a), would be rendered nugatory in the case of an alien refugee who entered lawfully as a nonimmigrant and remained unlawfully. If such an alien achieves nondeportability under Article 32 of the Convention, he becomes in effect a permanent resident. There is nothing in the legislative history of this provision to indicate that the Senate had any notion that this result would follow accession. Indeed, there is every indication that those who framed Article 32 on behalf of the United Nations never intended to saddle a host country with any such limitation. Thus, in an early report,[12] the Ad Hoc Committee stated:

The expression "lawfully within their territory" throughout this draft Convention would exclude a refugee who while lawfully admitted has overstayed the period for which he was admitted or was authorized to stay or who has violated any other condition attached to his admission or stay.

---

[10] S. Exec. Rept. No. 14, 90th Cong., 2d Sess. at 7.

[11] S. Exec. Rept. No. 14, 90th Cong., 2d Sess. at 10.

[12] United Nations Economic and Social Council, Report of the Ad Hoc Committee on Statelessness and Related Problems, March 2, 1950, at 47 (E/1618/Corr.1; E/AC.32/5/Corr.1).

Interim Decision #2192

In its report on the revised draft Convention,[13] the Ad Hoc Committee stated:

> The Committee decided that it was not always necessary to insert in the text definitions of expressions used. However, since some question was raised as to the phrase "lawfully in the territory", the Committee expressed the view that, in any event, a Contracting State may consider that a refugee is no longer lawfully in its territory if he is in contravention of terms imposed as a condition of his admission or sojourn.

With commendable candor, counsel for respondent has supplied us with a letter dated May 26, 1971, from the Deputy Representative of the United Nations High Commissioner for Refugees, quoting directly from advice received from its Geneva headquarters in response to counsel's question concerning the interpretation of Article 32. In pertinent part, it states:

> In determining whether a refugee is "lawfully in the territory" of a Contracting State, regard must be had to all the circumstances of his presence there, and in this respect the manner in which he originally entered the territory, i.e. lawfully or unlawfully, is not the only decisive factor.
>
> Art. 31 of the 1951 Convention recognizes the possibility that the status of a refugee who has entered illegally the territory of a Contracting State may subsequently be regularized. Conversely, the stay of a refugee who has entered in a regular manner, may subsequently become unlawful. This would for example be the case if the authorities of the country are not prepared to grant him residence beyond the *limited period* for which he was admitted or if they withdraw his residence permission on the ground that he has not complied with the *conditions* under which he was admitted, e.g. to pursue his studies. As long as his stay is "lawful," even though admitted temporarily, he can only be expelled on grounds of "national security and public order." If, however, his stay ceases to be "lawful" in the circumstances described above, he is no longer "lawfully in the territory of the Contracting State" and may therefore not invoke the special protection of Art. 32 of the 1951 Convention. (Emphasis in original).

There is nothing in the representations made to the Senate in support of accession which could lead it to conclude that Article 32 would radically alter the provisions of our deportation laws in the manner contended for by counsel. Quite the contrary, the Senate was led to believe that the laws relating to the immigration and deportation of alien refugees would remain substantially unaffected, that no amendatory legislation would be required to implement the Protocol, and that any minor changes could be handled administratively.

In his letter of submittal to the President, the Secretary of State commented with respect to Article 32:[14]

---

[13] United Nations Economic and Social Council, Report of the Ad Hoc Committee on Statelessness and Related Problems, Second Session, August 25, 1950, at 11, paragraph 20 (E/1850; E/AC.32/8).

[14] S. Exec. K, 90th Cong., 2d Sess. at VIII.

316

... Article 32(1) of the Convention provides that, "The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order." Many if not most of the grounds for deportation set forth in section 241 of the Immigration and Nationality Act, 8 U.S.C. 1251, are grounds of "national security or public order," including particularly the several provisions relating to subversive activities and criminal conduct. As refugees by definition are without a homeland, deportation of a refugee is a particularly serious measure, and it would not be humanitarian to deport a refugee for reasons of health or economic dependence.

In his statement to the Senate Committee on Foreign Relations, the State Department's representative, Laurence A. Dawson, asserted:[15]

... [W]hile the concept of guaranteeing safe and humane asylum is the most important element of the Protocol, accession does not in any sense commit the contracting state to enlarge its immigration measures for refugees. Rather, the asylum concept is set forth in the prohibition against the return of a refugee in any manner whatsoever to a country where his life or freedom would be threatened; and the prohibition under Article 32 against the deportation of a refugee lawfully in the territory of a Contracting State to any country except in cases involving national security or public order. The deportation provisions of the Immigration and Nationality Act, with limited exceptions, are consistent with this concept. The Attorney General will be able to administer such provisions in conformity with the Protocol without amendment of the Act.

The following colloquy before the Senate Committee with respect to the effect of Article 32 is illuminating:[16]

SENATOR SPARKMAN. Is there anything in here that conflicts with our existing immigration laws?

MR. DAWSON. I would answer that briefly and then ask Mrs. McDowell [of the Treaty Section, Office of the Legal Adviser, Department of State] to give a more authoritative answer. I would say that Article 32 which prohibits the expulsion of a refugee who is lawfully in this country to any country except on grounds of national security or public order would pose certain questions in connection with section 241 of our Immigration and Nationality Act, which states the deportation provisions. But I do not believe it would be in conflict. We believe most of those grounds in 241 are grounds which can be properly construed as having the basis of national security or public order, and we also are assured that those relatively limited cases which perhaps could not be so construed could be dealt with by the Attorney General without the enactment of any further legislation ...

MRS. McDOWELL. I think Mr. Dawson has covered it very well. We are assured by the Justice Department that this is their view. That the existing regulations which have to do with deportation would permit the Attorney General sufficient flexibility to enforce the provisions of this convention which are not presently contained in the Immigration and Nationality Act.

For example, section 241 of that Act allows the Attorney General to deport an alien for certain stated reasons. Most of these are criminal conduct of various kinds or subversive activities.

---

[15] S. Exec. Rept. No. 14, 90th Cong., 2d Sess. at 6.
[16] S. Exec. Rept. No. 14, 90th Cong., 2d Sess. at 8.

317

There are two categories, only two, that we think are not covered, and these are the deportation of an alien for reasons of mental illness or deficiency, where he has become institutionalized for that reason, or deportation on grounds that he has become a public charge. These two areas would not be enforced against refugees if the protocol were in force.

We cannot find in these materials any evidence that the Senate construed Article 32 as having the broad purpose contended for by respondent. That construction would radically alter the carefully articulated statutory provisions, devised by Congress through the years, for the selection, admission, adjustment of status, and deportation of aliens. We may not conclude, in the absence of more compelling proof, that the Senate intended that result when it acceded to the Protocol.

We need not now decide the full sweep of Article 32. The Senate was told and presumably concluded that the only refugees who by reason of Article 32 would no longer be deportable under section 241(a) of the Act would be those aliens lawfully in the United States who had been institutionalized because of mental illness or who had become public charges, under section 241(a)(3) or (8). We reject the notion that the Senate intended to preclude deportation (and thereby in effect to confer permanent residence) in the case of an alien refugee who entered lawfully as a nonimmigrant and remained unlawfully. Such an alien, even if not deportable to his country of origin because he would be persecuted there, could still conceivably be accepted by some other country. We sustain the immigration judge's conclusion that respondent, even if deemed to be a refugee, is deportable under section 241(a)(2) of the Act.

We must, therefore, confront the questions raised by counsel as to the effect of the Protocol and Convention on section 243(h) of the Act. These questions stem primarily from the definition of "refugee" in Article 1 of the Convention and from the provisions of Article 33. It is the position of counsel that these provisions affect not only the burden of proof under section 243(h) and the breadth of its coverage, but also the nature of the determination the Attorney General is permitted to make thereunder. We shall discuss each in turn. We note, in passing, that the legislative materials concerning Article 33 are as meager and inconclusive as those relating to Article 32, which we have already discussed.

On the burden of proof issue, 8 CFR 242.17(c) provides in pertinent part that, "The respondent has the burden of satisfying the [immigration judge] that he would be subject to persecution on account of race, religion, or political opinion as claimed." That statement is consonant with the conclusion of this Board, which the courts have sustained in many cases, that under section 243(h) the alien has the burden of presenting evidence showing a "clear

318

probability of persecution," *Cheng Kai Fu* v. *INS*, 386 F.2d 750 (C.A. 2, 1967), cert. den. 390 U.S. 1003; *Rosa* v. *INS*, 440 F.2d 100 (1 Cir., 1971); *Lena* v. *INS*, 379 F.2d 536 (C.A. 7, 1967); *Hamad* v. *INS*, 420 F.2d 645 (D.C. Cir., 1969). It is counsel's contention that under Articles 1 and 33, all an alien now need show is that he has a "well-founded fear of being persecuted" for any of the stated reasons. This change in terminology, asserts counsel, relieves the alien of the burden of showing a clear probability of persecution. "It is his own state of mind that is the primary test." (Respondent's brief on appeal, p. 3).

Clearly, the requirement that the fear be "well-founded" rules out an apprehension which is purely subjective. A fear which is illusory, neurotic or paranoid, however sincere, does not meet this requirement. An early report of the Ad Hoc Committee which framed the provision stated:[17]

> The expression "well-founded fear of being the victim of persecution for reasons of race, religion, nationality or political opinion" means that a person has either been actually a victim of persecution or can show good reason why he fears persecution.

Some sort of a showing must be made and this can ordinarily be done only by objective evidence. The claimant's own testimony as to the facts will sometimes be all that is available; but the crucial question is whether the testimony, if accepted as true, makes out a realistic likelihood that he will be persecuted. The burden of coming forward with the requisite evidence is obviously the claimant's. And if all he can show is that there is a merely conjectural possibility of persecution, his fear can hardly be characterized as "well-founded."

Certainly, there is nothing in the Senate proceedings to indicate that accession to the Protocol would radically affect section 243(h). Quite the contrary, as pointed out above, the general tenor of the representations was that the existing immigration laws already made provision for the refugee reforms sought by the Convention and Protocol. The Secretary of State's letter to the President makes one brief reference to section 243(h):[18]

> As stated earlier, foremost among the rights which the Protocol would guarantee to refugees is the prohibition (under Article 33 of the Convention) against their expulsion or return to any country in which their life or freedom would be threatened. This article is comparable to Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. Section 1254 [sic], and it can be implemented within the administrative discretion provided by existing regulations ...

---

[17] United Nations Economic and Social Council, Report of the Ad Hoc Committee on Statelessness and Related Problems, February 17, 1950, at 39 (E/1618; E/AC.32/5).

[18] S. Exec. K, 90th Cong., 2d Sess. at VIII.

In his testimony before the Senate Committee on Foreign Relations, the State Department's witness, Mr. Dawson, stated that one former obstacle to our accession was the requirement of section 243(h) that persecution be "physical," and that with removal of this requirement in October 1965, the problem no longer exists.[19] The clear implication is that section 243(h) was thereby brought into harmony with Article 33. It is noteworthy that, in responding to Senator Sparkman's question, "Is there anything in here that conflicts with our existing immigration laws?", Mr. Dawson made no mention of section 243(h) in relation to Article 33. It is clear that when it accepted the Protocol, the Senate had no notion that this would work a drastic alteration of section 243(h) and the gloss which it had acquired through the years before this Board and in the courts.

Section 243(h) in terms applies to persecution on account of "race, religion, or political opinion." It does not define what is meant by "persecution." Articles 1 and 33 of the Protocol encompass the three quoted classes and add two more, "nationality" and "membership of a particular social group." Article 1 defines a refugee in terms of persecution on any of the five grounds, without further defining the term. Article 33 makes no mention of persecution but forbids expulsion of a refugee to a place where his "life or freedom" would be threatened because of any of the five grounds. These seeming differences are clearly reconcilable.

The two new classes mentioned in Articles 1 and 33 are generically similar to the three which were the concern of Congress in section 243(h). In that provision Congress sought generally to shield aliens from the actions of their own home governments in singling them out for punitive treatment, not because of their individual misconduct or demerits, but solely because they are members of dissident or unpopular minority groups. The inclusion of the two new classes within the ambit of section 243(h), far from creating a conflict, is clearly compatible with the beneficent purposes underlying that provision.

Article 33 speaks in terms of threat to life or freedom on account of any of the five enumerated reasons. Such threats would also constitute subjection to persecution within the purview of section 243(h). The latter has also been construed to encompass economic sanctions sufficiently harsh to constitute a threat to life or freedom, *Dunat v. Hurney*, 297 F.2d 744 (3 Cir., 1962); cf. *Kovac v. INS*, 407 F.2d 102 (9 Cir., 1969). In our estimation, there is no substantial difference in the coverage of section 243(h) and Article 33. We

---

[19] S. Exec. Rept. No. 14, 90th Cong., 2d Sess. at 9.

are satisfied that distinctions in terminology can be reconciled on a case-by-case consideration as they arise.

This leaves only the question whether Article 33 compels a change in the nature of the determination which the Attorney General may now make under section 243(h). Article 33 speaks in mandatory terms: "No Contracting State shall expel or return a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened. . . ." While the second paragraph of Article 33 carves out exceptions where the alien refugee constitutes a security threat to the host country or has been convicted of a particularly serious crime, in cases outside the exceptions the provision seems to leave no room for the exercise of discretion. Section 243(h), on the other hand, has been construed as giving the Attorney General a degree of discretion in reaching his decision. Close analysis reveals, however, that there is no real conflict between the two provisions.

As the immigration judge has pointed out at pages 11–14 of his excellent opinion, the ancestor of section 243(h) had many seeming similarities to Article 33 which section 243(h) was designed to eliminate. Section 20(a) of the Immigration Act of 1917, as amended by section 23 of the Internal Security Act of 1950, 64 Stat. 987, 8 U.S.C. 156(a) (1946 ed., Supp. IV), provided that, "No alien shall be deported under any provisions of this Act to any country in which the Attorney General shall find that such alien would be subjected to physical persecution." The cases held that under this provision where an alien raised a persecution claim, the Attorney General had to find as fact that he would not be subject to physical persecution in the particular country before he could be sent there, *U.S. ex rel. Harisiades* v. *Shaughnessy*, 187 F.2d 137, 142 (C.A. 2, 1951), affirmed 342 U.S. 580 (1952); *Sang Ryup Park* v. *Barber*, 107 F.Supp. 603 and 107 F.Supp. 605 (N.D. Cal., 1952); *U.S. ex rel. Chen Ping Zee* v. *Shaughnessy*, 107 F.Supp. 607 (S.D. N.Y., 1952); U.S. ex rel. *Watts* v. *Shaughnessy*, 107 F. Supp. 613 (S.D. N.Y., 1952). It was indicated that the statute contemplated a fact finding by the Attorney General based on competent evidence and that discretionary power was not conferred.

Section 243(h), on the other hand, is cast in far different terms. Instead of directing that no alien "shall be deported," section 243(h) merely "authorizes" the Attorney General to withhold deportation. Instead of referring to a "finding" by the Attorney General, section 243(h) makes reference only to his "opinion." Under the circumstances, it is not surprising that the cases have construed section 243(h) as giving the Attorney General a "broad discretion" to withhold deportation, *Muskardin* v. *INS*, 415 F.2d 865 (2 Cir., 1969); *Kasravi* v. *INS*, 400 F.2d 675 (C.A. 9, 1968);

*Namkung* v. *Boyd*, 226 F.2d 395 (C.A. 2, 1955); *U.S. ex rel. Dolenz* v. *Shaughnessy*, 206 F.2d 392 (C.A. 2, 1953).

It seems clear that the humanitarian values sought to be covered by section 243(h) distinguish it from the Act's other provisions for discretionary relief from deportation in which the Attorney General is given power, in his discretion, to grant relief to aliens who meet the prescribed eligibility requirements. Those provisions involve a two-stage proceeding: (1) the establishment of statutory eligibility; (2) the exercise of administrative discretion, favorably or unfavorably to the alien, by the Attorney General or his delegate. The cases are legion that even where statutory eligibility is made out, relief may still be denied in the exercise of discretion. See *Hintopoulos* v. *Shaughnessy*, 353 U.S. 72 (1957) (suspension of deportation); *Thomaidis* v. *INS*, 431 F.2d 711 (C.A. 9, 1970), cert. den. 401 U.S. 954 (section 245 adjustment); *Lum Wan* v. *Esperdy*, 321 F.2d 123 (C.A. 2, 1963) (section 249 registry); *Hamad* v. *INS*, 420 F.2d 645 (D.C. Cir., 1969) (voluntary departure).

While the section 243(h) cases also speak in terms of the Attorney General's discretion, we know of none in which a finding has been made that the alien has established the clear probability that he will be persecuted and in which section 243(h) withholding has nevertheless been denied in the exercise of administrative discretion. We are fortified in this view by the statement of the Service's Appellate Trial Attorney in his brief before us (at page 14).[20] It is highly probable that in referring to the Attorney General's "broad discretion" under section 243(h), the cases contemplate the manner in which the Attorney General arrives at his opinion and the limited scope of judicial review, rather than the eligibility-discretion dichotomy. Thus, in an early and much-cited case arising under that section, *U.S. ex rel. Dolenz* v. *Shaughnessy*, 206 F.2d 392, 395 (C.A. 2, 1953) the court stated:

> ... That section modified the language of the former statute in a manner which shows clearly, we think, that the withholding of deportation in cases where the alien fears persecution rests wholly in the administrative judgment and "opinion" of the Attorney General or his delegate. The courts may not substitute their judgment for his. Doubtless a court might intervene to stay deportation, if the Attorney General or his delegate should deny the alien any opportunity to present evidence on the subject of persecution or should refuse to consider the evidence presented by the alien. But we see nothing in the statute to suggest that the courts may insist that the Attorney General's

---

[20] "In actual practice there has been no case under section 243(h) in which it has been held that the Attorney General's discretion dictated the deportation of an alien to a country where there was a well-founded reason to believe that he would be persecuted. If such a contingency were to arise, it is inconceivable that it could arise in anything other than the context permitted under paragraph 2 of Article 33, namely, national security or danger to the community."

opinion be based solely on evidence which is disclosed to the alien. In his official capacity the Attorney General has access to confidential information derived from the State Department or other intelligence services of the Government which may be of great assistance to him in making his decision as to the likelihood of physical persecution of the alien in the country to which he is to be deported. We believe Congress intended the Attorney General to use whatever information he has. To preclude his use of confidential information unless he is willing to disclose it to the alien would defeat this purpose. Moreover, the very nature of the decision he must make concerning what the foreign country is likely to do is a political issue into which the courts should not intrude ...

While some of the cases have referred to the separate eligibility-discretion elements in a section 243(h) context, this seems to have been done largely in relation to the scope of judicial review.[21] In none was a denial of relief sustained as a valid exercise of discretion, in the face of a finding that the alien would probably be persecuted.[22] One commentator has recently appraised the situation thus:[23]

... Some authorities have suggested that there is a distinction between determining whether persecution is probable and in determining whether to exercise discretion to withhold deportation, if the probability of persecution is established. However, this attempted severance seems untenable since it is inconceivable that the Attorney General would direct or that a court would uphold deportation to a place where persecution can be anticipated. The sounder approach is to regard the entire determination as a discretionary assessment of the likelihood of persecution, subject to the normal criteria of judicial review.

In any event, Article 33 can produce no meaningful change in the way section 243(h) has been applied. Thus far, relief thereunder has never been denied to an alien who has established that he will probably be persecuted. If a case should arise in which the alien refugee is found to be a security risk or a danger to the community because convicted of a particularly serious crime, the second paragraph of Article 33 specifically permits deportation.

In summary, we conclude that Article 33 has effected no substantial changes in the application of section 243(h), either by way of burden of proof, coverage, or manner of arriving at decisions.

---

[21] *Khalil v. District Director,* 457 F.2d 1276, fn. 4 (C.A. 9, 1972); *Shkukani v. INS,* 435 F.2d 1378 (C.A. 8, 1971), cert. den., 403 U.S. 920; *Hamad v. INS,* 420 F.2d 645 (D.C. Cir., 1969); *Hosseinmardi v. INS,* 405 F. 2d 25 (C.A. 9, 1969); *Kasravi v. INS,* 400 F.2d 675 (C.A. 9, 1968); cf. *U.S. ex rel. Kordic v. Esperdy,* 386 F.2d 232 (C.A. 2, 1967), cert. den., 392 U.S. 935.

[22] We regard as dictum our intimation in *Matter of Liao,* 11 I. & N. Dec. 113, 119 (BIA, 1965) that section 243(h) withholding could be denied in the exercise of discretion on the basis of factors other than those related to the persecution claim. After reviewing the record, we rejected the persecution claim as not established by the evidence.

[23] 1 Gordon & Rosenfield, *Immigration Law and Procedure* 5-124 (1972 Supp.).

Since it appears that England will no longer receive the respondent, the question whether he will be persecuted in Hungary must be faced. We turn, then, to appraise the immigration judge's decision on the record in this case.

The evidence has been set forth in detail in the immigration judge's painstaking opinion and need not be repeated at length. The respondent left Hungary at the age of 15 during the 1956 uprising. His parents, considered members of the capitalist class, had had their lands and their home in Budapest confiscated in the post-World War II Communist take-over. His father had to work at repairing street cars and his mother, who had never worked before, had to work as a locker lady in a bathhouse. Respondent was barred from entering college for the ostensible reason that his high school record was inadequate, but he suspects the real reason is that his parents were considered capitalists. After some time in refugee camps in Austria and Germany, respondent had settled in England, where he lived continuously until his arrival here in 1966 as a visitor. After respondent had left Hungary, his father had disappeared for five or six months, but he is now living and working in Hungary. Respondent's persecution claim is based on his assertion, supported by some evidence, that he will face criminal prosecution in Hungary for having departed illegally. He also feared that his long sojourn in Western Europe and the United States would lead the Communists to consider him a threat as one who might spread Western propaganda. The immigration judge concluded that there was no reason to believe that the penalty imposed for illegal departure would be so severe as to be considered persecution. The other fears respondent had expressed were dismissed as conjectural. The State Department, in response to a Service report, stated that it had no information concerning respondent other than that supplied by the Service and concluded that it was "unable to express the opinion" that respondent "would be subject to persecution should he return to Hungary."

On this record, the immigration judge found that respondent had failed to establish the likelihood that he would be persecuted in Hungary because of his race, religion or political opinion. We agree with that conclusion. Even if we apply the nomenclature of Articles 1 and 33, we are satisfied that respondent has failed to show a well-founded fear that his life or freedom will be threatened in Hungary on account of his race, religion, nationality, membership of a particular social group or political opinion.

The conclusion we have reached would ordinarily lead us to dismiss the appeal. However, during the pendency of this appeal the State Department's Office of Refugee and Migration Affairs has expressed an interest and has submitted additional materials.

Since these were not available to either counsel for respondent or the Service, we have not considered them in arriving at our decision. We shall, however, remand the case to the immigration judge in order that they may be made part of the record and to permit such further proceedings as may be appropriate in the light of the new material.

ORDER: The record is remanded to the immigration judge for further proceedings not inconsistent with this opinion.