# Status of Persons Who Emigrate for Economic Reasons Under the Refugee Act of 1980

Under the Refugee Act of 1980, a "refugee" is defined as a victim of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion; economic hardship by itself is not a basis for eligibility as a refugee under the Act.

Refugee status under the Refugee Act of 1980 should normally be considered on an individual basis. While the Immigration and Naturalization Service may apply commonly known circumstances to people falling within particular groups without requiring the facts necessary to determine eligiblity to be proved individually in each and every case, group determinations should generally be reserved for situations in which the need to provide assistance is extremely urgent and political reasons preclude an individual determination of status.

Fear of prosecution for departing a country in violation of its travel laws is not sufficient to entitle an individual to refugee status, unless it can be shown that such prosecution would be motivated by one of the proscribed reasons. If the country treats departure as a political act and punishes that act in a harsh and oppressive manner, such circumstances would qualify as "persecution on account of . . . political opinion" under the Act.

August 24, 1981

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, IMMIGRATION AND NATURALIZATION SERVICE

This responds to your request for our views on the memorandum prepared by your Office titled "Processing of Refugees of Special Humanitarian Concern," dated June 25, 1981 (Memorandum). We generally agree with the conclusions set forth in that Memorandum, but add the following comments regarding whether persons who leave a country for economic reasons may be considered refugees under the Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102 (Act) because they are threatened with harsh treatment upon return to their country. The answer to this question depends on what constitutes a refugee under the Act.

The Act created a new category of aliens called "refugee[s]." Under the existing law prior to the adoption of the Act, admission was limited to "conditional entrants" who were fleeing from persecution "on account of race, religion, or political opinion" in the Middle East or a Communist country *or* who had been "uprooted by catastrophic natural calamity." 8 U.S.C. §1153(e)(7)(Supp. III 1979). Ending these geographic and ideological limits was one of the major reforms intended

by the Act. The comments of Representative Holtzman, chairwoman of the House subcommittee in charge of the bill, are typical: "The new definition . . . will give our Government the flexibility to deal with crises such as the evacuation of Vietnam in 1975 and to respond as well to situations in countries such as Cuba or Chile today where there are political detainees or prisoners of conscience." 126 Cong. Rec. 4499 (1980).

As a result, the status of "conditional entrant" was eliminated and that of "refugee" was created. Section 201(a) of the Act, (to be codified at 8 U.S.C. § 1101(a)(42)), defines a refugee as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

The expansion of the definition to eliminate ideological and geographical restrictions was intended to conform our law to the definition found in the United Nations Convention and Protocol Relating to the Status of Refugees (Convention), Jan. 31, 1967, 19 U.S.T. 6223, 6259 T.I.A.S. No. 6577.[1]

> [T]he new definition will bring United States law into conformity with our international treaty obligations under the United Nations Protocol Relating to the Status of Refugees which the United States ratified in November 1968, and the United Nations Convention Relating to the Status of Refugees which is incorporated by reference into United States law through the Protocol.

S. Rep. No. 256, 96th Cong., 1st Sess. 4 (1979). *See also* S. Rep. No. 590, 96th Cong., 2d Sess. 19 (1980); H.R. Rep. No. 781, 96th Cong., 2d Sess. 19 (1980); H.R. Rep. No. 608, 96th Cong., 1st Sess. 9 (1979); 126 Cong. Rec. 23,232 (1979) (remarks of Sen. Kennedy, floor manager); *id.* at 4499, 4503 (1980); *id.* at 3757 (1980). It was not intended to require us to accept for admission the millions of individuals who might qualify as refugees. H.R. Rep. No. 608, *supra,* at 10; 126 Cong. Rec. 23,232 (1979); *id.* at 4507 (1980). Instead, a cap of 50,000 was placed on annual admissions through 1982. Act, § 207(a)(1) to be codified at 8 U.S.C. § 1157(a)(1).[2] Further, all refugee admissions must "be allocated among

---

[1] The exception contained in the prior law for victims of natural calamities—who are likely to become economic migrants—was eliminated.

[2] After 1982, the President will set the limit. In an emergency situation, the President may now, after consultation with Congress, admit a fixed number of additional refugees. Act, § 207(b), to be codified at 8 U.S.C. § 1157(b).

refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation [with Congress]." *Id.,* § 207(a)(3), to be codified at 8 U.S.C. § 1157(a)(3). *See also id.,* § 207 (b), (c)(1) to be codified at 8 U.S.C. § 1157, (b), (c)(1).

There are three aids that can be used to determine whether Congress intended to allow purely economic migrants to claim refugee status under the Act.[3] First is the legislative history of the Protocol when it was ratified by the Senate in 1968, thereby automatically adopting the Convention. Second is the U.N.'s interpretation of the Convention. Third is the courts' interpretations over the years of 8 U.S.C. § 1253(h).

A basic rule of statutory construction is that a statute based upon another statute, even that of a foreign state, "generally is presumed to be adopted with the construction which it has received." *James* v. *Appel,* 192 U.S. 129, 135 (1904).[4] In 1979, the United Nations High Commissioner for Refugees (UNHCR) issued a nonbinding guide to aid the Convention's signatory states in determining whether someone was a refugee. Handbook on Procedures and Criteria for Determining Refugee Status Under the Convention and Protocol (Handbook). We assume that Congress was aware of the criteria articulated in the Handbook when it passed the Act in 1980, and that it is appropriate to consider the guidelines in the Handbook as an aid to the construction of the Act.[5]

A second relevant rule of statutory construction is that provisions of a statute that are repeated in an amendment to the statute, either in the same or equivalent words, are considered a continuation of the original law. 1A Sands, Sutherland on Statutory Construction § 22.33 (4th ed. 1972) (Sands). "[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard* v. *Pons,* 434 U.S. 575, 581 (1978).

Prior to its amendment in 1980, 8 U.S.C. § 1253(h) authorized the Attorney General to suspend the deportation of any alien who "would be subject to persecution on account of race, religion or political opinion." [6] Numerous cases have discussed the meaning of "persecution on account of . . . political opinion." Section 203(e) of the Act added "nationality" and "membership in a particular social group," so that

---

[3] The legislative history of the Act contains no aid to interpretation beyond repeated statements that it is adopting the Convention's definition of "refugee."

[4] *See also Willis* v. *Eastern Trust & Banking Co.,* 169 U.S. 295, 307–08 (1898); *Cathcart* v. *Robinson,* 30 U.S. (5 Pet.) 264, 280 (1831); *Roberto* v. *Aguon,* 519 F.2d 754, 755 (9th Cir. 1975); *Chauffeurs, Local Union No. 364* v. *Ruan Transport Corp.,* 473 F. Supp. 298, 302–03 (N.D. Ind. 1979).

[5] The guidelines from the Handbook are just that—guidelines. They may be accepted or rejected with respect to a signatory state's interpretation of the Convention, and, more importantly, with respect to your interpretation of the Act.

[6] Prior to 1965, the section referred only to "physical persecution." 8 U.S.C. § 1253(h) (1964).

§ 1253(h) now tracks the definition of "refugee" found in § 1101(a)(42). These two provisions should be construed together. 2A Sands, *supra,* § 51.02. The earlier cases remain relevant, therefore, for a discussion of persecution based on political opinion.

We believe that the definition of "refugee" is limited by both its plain language and these interpretive aids to those who are victims of persecution based on one of the five bases named: race, religion, nationality, membership in a particular social group, or political opinion. Political persecution may take the form of economic reprisals, such as denying individuals the opportunity to work.[7] Likewise, an individual suffering economic hardship may also become the victim of political persecution because of political upheavals. Economic hardship itself, however, is not a basis for eligibility as a refugee under the Act. This interpretation is supported by all the sources consulted. *See, e.g.,* S. Ex. Rep. No. 14, 90th Cong., 2d Sess. 13 (1968). Economic migrants, who are moved "exclusively" by economic conditions, are not refugees. Handbook, ¶ 62. *See also Cheng Kai Fu* v. *INS,* 386 F.2d 750, 753 (2d Cir. 1967), *cert. denied,* 390 U.S. 1003 (1968) ("[P]hysical hardship or economic difficulties . . . shared by many others . . . do not amount to . . . particularized persecution.")

The Bureau for Refugee Programs has argued that all persons who leave Laos, Kampuchea, and Vietnam are, regardless of their motivation for leaving, treated as political opponents on their return and will probably suffer political persecution.[8] The Bureau "contends that there is no need to examine individual cases, as blanket refugee status for all these [refugees] is mandated. . . . The act of leaving will be all that is necessary to become a refugee." Memorandum, at 6. You have expressed disagreement with this position, on both legal and policy grounds. Memorandum, at 5–9. We agree with you that applications for refugee status should be considered on an individual basis, but suggest that the law allows considerable discretion in means by which these determinations are made and certainly does not foreclose your application of commonly known circumstances to people falling within particular groups. For example, where it has been shown to your satisfaction that a particular country persecutes all individuals with particular political views, it would not seem necessary for you to require that fact to be proved individually in each and every case.

We also concur with you that the "act of leaving" in and of itself is not alone sufficient to entitle an individual to refugee status. Nor do we feel that the fact of prosecution for the violation of a nation's travel

---

[7] "The denial of an opportunity to earn a livelihood in a country such as the one involved here is the equivalent of a sentence to death by means of slow starvation and none the less final because it is gradual." *Dunat* v. *Hurney,* 297 F.2d 744, 746 (3d Cir. 1961) *See also Soric* v *Flagg,* 303 F 2d 289, 290 (7th Cir. 1962); Handbook, ¶ 63

[8] Letter from the Acting Director, Bureau for Refugee Programs, to the Acting Commissioner, Immigration and Naturalization Service, Feb. 27, 1981.

laws rises to the level of "persecution on account of . . . political opinion." However, systematic and harsh punishment for the act of leaving a country may, in some circumstances, meet this standard. Whether a particular situation meets this standard is largely a factual matter which must be determined in individual situations depending upon the extent to which a country punishes those who attempt to leave.

This latter conclusion is reflected in the source material. Our courts, the U.N., and the Immigration and Naturalization Service (INS) have recognized that the threat of prosecution for violations of travel laws does not in itself constitute persecution.[9] It is when the prosecution is politically motivated that the courts have said they will intervene. *Berdo* v. *INS*, 432 F.2d 824, 845–47 (6th Cir. 1970); *Kovac* v. *INS*, 407 F.2d 102, 104–05 (9th Cir. 1969); *Kalatjis* v. *Rosenberg*, 305 F.2d 249, 252 (9th Cir. 1962); *In re Nagy*, 11 I. & N. Dec. 888, 891–92 (1966); Handbook, ¶ 61.[10] If individuals leave a country for economic reasons, their behavior may be condemned by their country, but their disagreement with the state is presumably based on economics, not politics. Prosecution for violation of the state's travel laws when they return is not persecution unless the laws are applied for one of the proscribed reasons. *In re Chumpitazi*, 16 I. & N. Dec. 629, 633–34 (1978); *In re Janus and Janek*, 12 I. & N. Dec. 866, 876 (1968); Handbook, ¶ 61. Once the alien has proved that the laws are being applied for a proscribed reason, however, he is eligible to be recognized as a refugee. If the country treats the departure as a political act and punishes that act in a harsh and oppressive manner, we believe that such circumstances fall within the definition of the Act. *Henry* v. *INS*, 552 F.2d 130, 131 (5th Cir. 1977) (Petitioners alleged that "anyone who had fled the regime [in Haiti], would be received with hostility by the present government. If proved, such an allegation might form a sound basis for fear of persecution regardless of the placidity of an individual's political past.")

You have questioned whether this is a proper interpretation because "a foreign government could in effect create 'political' opponents for opportunistic reasons" by simply declaring that citizens who leave will be deemed to be political opponents. However, we believe that such a declaration would not be sufficient proof that an individual had a well-

---

[9] West Germany and Austria have adopted a somewhat broader interpretation. Prosecution for leaving certain countries will be deemed to be persecution *if* the alien left because of his political opinions. Memorandum to UNHCR Branch Office for the United States, from Director of Protection, Jan. 21, 1981, ¶¶ 27–29, 32.

[10] In *Sovich* v. *Esperdy*, 319 F 2d 21, 28–29 (2d Cir. 1963), the court stated that imprisonment for illegal departure was punishment and only became persecution if it was excessive. "However repugnant to our own concept of justice, a brief confinement for illegal departure or for political opposition to a totalitarian regime would not necessarily fall within the ambit of [§ 243(h)]. We are unwilling to believe, however, that Congress has precluded from relief under § 243(h) an alien threatened with long years of imprisonment, perhaps even life imprisonment. . . ." *Accord, In re Dunar*, 14 I. & N. Dec. 310, 324 (1973).

founded fear that he would be persecuted on his return. Issues of fact cannot be resolved in the absence of information about factors such as whether the government is really enforcing the policy, whether the policy is being applied against all returnees or just some, whether the policy involves application of longstanding domestic travel laws or new restrictions, and whether it is likely that the alien's departure and subsequent return will be noticed by his country. *Compare Fleurinor* v. *INS,* 585 F.2d 129, 132–33 (5th Cir. 1978) *with Coriolan* v. *INS,* 559 F.2d 993, 1002–04 (5th Cir. 1977). As the drafters of the Convention said, the definition of refugee is meant to cover a person who "has either been actually a victim of persecution or can show good reason why he fears persecution," U.N. Doc. E/1618 and Corr. 1, at 11 (1950), and the signatory state is the ultimate judge of the validity of that fear. Moreover, as noted earlier, the law does not require the United States to accept an individual even if he does qualify as a refugee. Act, § 207(a)(3), (b), (c)(1).[11]

Furthermore, your concern that a foreign government could "create 'political' opponents for opportunistic reasons" arises from the language of the Act itself. A foreign nation may do so whenever it determines to persecute particular groups and may single out virtually any social group or political view to implement its "opportunistic reasons." If this possibility is to be eliminated, Congress has the means at its disposal to do so.

As noted above, an application for refugee status should normally be reviewed on an individual basis. One of the major purposes of the Act was to allow the President to select those refugees for admission who were of "special humanitarian concern to the United States." Act, § 207(a)(3), to be codified at 8 U.S.C. § 1157(a)(3). Individual interviews would seem to be the easiest and best way to identify those who have an especially strong claim on us as well as to determine how "well-founded" the fear is in differently situated individuals. *See* Handbook, ¶¶ 44–45. A country may produce political refugees as well as economic migrants and the Act requires that the two groups be distinguished. *In re Williams,* 16 I. & N. Dec. 697, 703 (1979) (Haiti). Group determinations are usually reserved for situations in which the need to provide assistance is extremely urgent and political reasons preclude an individual determination of status.

We are not in a position to evaluate the situation that now exists in Southeast Asia with regard to whether Laos, Kampuchea, and Vietnam are persecuting those who leave because departure is viewed as a political act.[12] We do believe, as the courts have recognized, that an

---

[11] You have expressed concern that the government will be swamped with asylees, 8 U.S.C. § 1253(h), if a country close to the United States adopts such a policy. Memorandum, at 8–9. We believe that a solution to such a problem, to the extent it exists, must come from the Legislative Branch.

[12] Letter from the Acting Director, Bureau for Refugee Programs, to the Acting Commissioner, Immigration and Naturalization Service, Feb. 27, 1981, at 3

alien outside his country may have a well-founded fear of persecution if his country is persecuting departure as a political act. *Henry, supra.* Whether the fear exists should, except in exceptional circumstances, be evaluated on an individual basis.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*