# IMMIGRATION AND NATURALIZATION SERVICE *v.* CARDOZA-FONSECA

No. 85–782.   Argued October 7, 1986—Decided March 9, 1987

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 450. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 452. POWELL, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE, J., joined, *post*, p. 455.

*Deputy Solicitor General Wallace* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Kuhl, Bruce N. Kuhlik*, and *David V. Bernal*.

*Dana Marks Keener* argued the cause for respondent. With her on the brief was *Bill Ong Hing*.*

---

*Briefs of *amici curiae* urging affirmance were filed for the United Nations High Commissioner for Refugees by *Ralph G. Steinhardt;* for the American Civil Liberties Union et al. by *Carol Leslie Wolchok, Burt Neuborne, Lucas Guttentag, Jack Novik*, and *Robert N. Weiner;* for the American Immigration Lawyers Association by *Ira J. Kurzban;* for the International Human Rights Law Group et al. by *E. Edward Bruce;* and for the Lawyers Committee for Human Rights et al. by *Richard F. Ziegler, Arthur C. Helton, Samuel Rabinove, Richard T. Foltin, Ruti G. Teitel, Steven M. Freeman*, and *Richard J. Rubin*.

JUSTICE STEVENS delivered the opinion of the Court.

Since 1980, the Immigration and Nationality Act has provided two methods through which an otherwise deportable alien who claims that he will be persecuted if deported can seek relief. Section 243(h) of the Act, 8 U. S. C. § 1253(h), requires the Attorney General to withhold deportation of an alien who demonstrates that his "life or freedom would be threatened" on account of one of the listed factors if he is deported. In *INS* v. *Stevic,* 467 U. S. 407 (1984), we held that to qualify for this entitlement to withholding of deportation, an alien must demonstrate that "it is more likely than not that the alien would be subject to persecution" in the country to which he would be returned. *Id.,* at 429–430. The Refugee Act of 1980, 94 Stat. 102, also established a second type of broader relief. Section 208(a) of the Act, 8 U. S. C. § 1158(a), authorizes the Attorney General, in his discretion, to grant asylum to an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." § 101(a)(42), 8 U. S. C. § 1101(a)(42).

In *Stevic,* we rejected an alien's contention that the § 208(a) "well-founded fear" standard governs applications for withholding of deportation under § 243(h).[1] Similarly, today we reject the Government's contention that the § 243(h) standard, which requires an alien to show that he is more likely than not to be subject to persecution, governs applications for asylum under § 208(a). Congress used different, broader language to define the term "refugee" as used in § 208(a) than it used to describe the class of aliens who have

---

[1] We explained that the Court of Appeals' decision had rested "on the mistaken premise that every alien who qualifies as a 'refugee' under the statutory definition is also entitled to a withholding of deportation under § 243(h). We find no support for this conclusion in either the language of § 243(h), the structure of the amended Act, or the legislative history." *INS* v. *Stevic,* 467 U. S., at 428.

a right to withholding of deportation under § 243(h). The Act's establishment of a broad class of refugees who are eligible for a discretionary grant of asylum, and a narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger, mirrors the provisions of the United Nations Protocol Relating to the Status of Refugees, which provided the motivation for the enactment of the Refugee Act of 1980. In addition, the legislative history of the 1980 Act makes it perfectly clear that Congress did not intend the class of aliens who qualify as refugees to be coextensive with the class who qualify for § 243(h) relief.

I

Respondent is a 38-year-old Nicaraguan citizen who entered the United States in 1979 as a visitor. After she remained in the United States longer than permitted, and failed to take advantage of the Immigration and Naturalization Service's (INS) offer of voluntary departure, the INS commenced deportation proceedings against her. Respondent conceded that she was in the country illegally, but requested withholding of deportation pursuant to § 243(h) and asylum as a refugee pursuant to § 208(a).

To support her request under § 243(h), respondent attempted to show that if she were returned to Nicaragua her "life or freedom would be threatened" on account of her political views; to support her request under § 208(a), she attempted to show that she had a "well-founded fear of persecution" upon her return. The evidence supporting both claims related primarily to the activities of respondent's brother who had been tortured and imprisoned because of his political activities in Nicaragua. Both respondent and her brother testified that they believed the Sandinistas knew that the two of them had fled Nicaragua together and that even though she had not been active politically herself, she would be interrogated about her brother's whereabouts and

activities. Respondent also testified that because of her brother's status, her own political opposition to the Sandinistas would be brought to that government's attention. Based on these facts, respondent claimed that she would be tortured if forced to return.

The Immigration Judge applied the same standard in evaluating respondent's claim for withholding of deportation under § 243(h) as he did in evaluating her application for asylum under § 208(a). He found that she had not established "a clear probability of persecution" and therefore was not entitled to either form of relief. App. to Pet. for Cert. 27a. On appeal, the Board of Immigration Appeals (BIA) agreed that respondent had "failed to establish that she would suffer persecution within the meaning of section 208(a) or 243(h) of the Immigration and Nationality Act." *Id.*, at 21a.

In the Court of Appeals for the Ninth Circuit, respondent did not challenge the BIA's decision that she was not entitled to withholding of deportation under § 243(h), but argued that she was eligible for consideration for asylum under § 208(a), and contended that the Immigration Judge and BIA erred in applying the "more likely than not" standard of proof from § 243(h) to her § 208(a) asylum claim. Instead, she asserted, they should have applied the "well-founded fear" standard, which she considered to be more generous. The court agreed. Relying on both the text and the structure of the Act, the court held that the "well-founded fear" standard which governs asylum proceedings is different, and in fact more generous, than the "clear probability" standard which governs withholding of deportation proceedings. 767 F. 2d 1448, 1452–1453 (1985). Agreeing with the Court of Appeals for the Seventh Circuit, the court interpreted the standard to require asylum applicants to present " 'specific facts' through objective evidence to prove either past persecution or 'good reason' to fear future persecution." *Id.*, at 1453 (citing *Carvajal-Munoz* v. *INS*, 743 F. 2d 562, 574 (CA7 1984)).

The court remanded respondent's asylum claim to the BIA to evaluate under the proper legal standard. We granted certiorari to resolve a Circuit conflict on this important question.[2] 475 U. S. 1009 (1986).[3]

---

[2] Compare *Carcamo-Flores* v. *INS*, 805 F. 2d 60 (CA2 1986); *Guevara-Flores* v. *INS*, 786 F. 2d 1242 (CA5 1986), cert. pending, No. 86–388; *Cardoza-Fonseca* v. *INS*, 767 F. 2d 1448 (CA9 1985) (case below); *Carvajal-Munoz* v. *INS*, 743 F. 2d 562, 574 (CA7 1984); *Youkhanna* v. *INS*, 749 F. 2d 360, 362 (CA6 1984); with *Sankar* v. *INS*, 757 F. 2d 532, 533 (CA3 1985).

The Third Circuit is the only Circuit to decide since our decision in *INS* v. *Stevic*, 467 U. S. 407 (1984), that the standards remain identical. It reached this conclusion, however, not because post-*Stevic* analysis compelled it, but because it considered itself bound by its pre-*Stevic* decision in *Rejaie* v. *INS*, 691 F. 2d 139 (1982). See *Sankar, supra,* at 533.

[3] We have considered whether this case has been rendered moot by the recent enactment of the Immigration Reform and Control Act of 1986. Pub. L. No. 99–603, 100 Stat. 3359. While nothing in that Act affects the statutory provisions related to asylum or withholding of deportation, Title II of the 1986 Act creates a mechanism by which certain aliens may obtain legalization of their status. Section 201(a) of the 1986 Act establishes that, with certain exceptions, an alien who has resided continuously in the United States in an unlawful status since before January 1, 1982, is entitled to have his or her status adjusted to that of an alien lawfully admitted for temporary residence. An alien who obtains this adjustment of status under the new Act is then eligible for a second adjustment to the status of permanent resident after a waiting period of 18 months. See § 245A(a). An alien who obtains permanent residence status through this route is not, however, eligible for all benefits usually available to permanent residents. For example, aliens who obtain permanent residence through this program are not eligible for certain public welfare benefits for five years after the grant of the new status. See § 245A(H).

The record indicates that respondent may well be eligible for eventual adjustment of status if she makes a timely application after the Attorney General establishes the procedures for administering Title II. It would therefore appear that respondent might become a permanent resident by invoking the new procedures even if she is unsuccessful in her pending request for asylum. Nonetheless the possibility of this relief does not render her request for asylum moot. First, the legalization provisions of the 1986 Act are not self-executing, and the procedures for administering the new Act are not yet in place. Even if the benefits were identical, therefore,

## II

The Refugee Act of 1980 established a new statutory procedure for granting asylum to refugees.[4]  The 1980 Act added a new § 208(a) to the Immigration and Nationality Act of 1952, reading as follows:

> "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."  94 Stat. 105, 8 U. S. C. § 1158(a).

Under this section, eligibility for asylum depends entirely on the Attorney General's determination that an alien is a

there is no way of knowing at this time whether respondent will be able to satisfy whatever burden is placed upon her to demonstrate eligibility.  Cf. *INS* v. *Chadha*, 462 U. S. 919, 937 (1983).  Second, respondent might be able to obtain permanent residence through the asylum procedure sooner than through the legalization program; if she satisfies certain conditions, she may become eligible for adjustment of status to that of permanent resident 12 months after a grant of asylum.  See 8 CFR §§ 209.1–209.2 (1986).  Under Title II of the new Act, by contrast, there is an 18-month waiting period.  In light of these factors, we are persuaded that the controversy is not moot.

Nor do we believe that the new Act makes it appropriate to exercise our discretion to dismiss the writ of certiorari as improvidently granted.  The question presented in this case will arise, and has arisen, in hosts of other asylum proceedings brought by aliens who arrived in the United States after January 1, 1982, or who are seeking entry as refugees from other countries.  The importance of the legal issue makes it appropriate for us to address the merits now.

[4] Prior to the amendments, asylum for aliens who were within the United States had been governed by regulations promulgated by the INS, pursuant to the Attorney General's broad parole authority.  See n. 14, *infra*.  Asylum for applicants who were not within the United States was generally governed by the now-repealed § 203(a)(7) of the Act, 8 U. S. C. § 1153(a)(7) (1976 ed.).  See *infra*, at 433.

"refugee," as that term is defined in § 101(a)(42), which was also added to the Act in 1980.   That section provides:

"The term 'refugee' means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ."   94 Stat. 102, 8 U. S. C. § 1101(a)(42).

Thus, the "persecution or well-founded fear of persecution" standard governs the Attorney General's determination whether an alien is eligible for asylum.[5]

In addition to establishing a statutory asylum process, the 1980 Act amended the withholding of deportation provision,[6]

---

[5] It is important to note that the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee.   Instead, a finding that an alien is a refugee does no more than establish that "the alien *may* be granted asylum *in the discretion of the Attorney General.*" § 208(a) (emphasis added).   See *Stevic,* 467 U. S., at 423, n. 18; see also *infra,* at 441–444.

[6] Asylum and withholding of deportation are two distinct forms of relief. First, as we have mentioned, there is no entitlement to asylum; it is only granted to eligible refugees pursuant to the Attorney General's discretion. Once granted, however, asylum affords broader benefits.   As the BIA explained in the context of an applicant from Afghanistan who was granted § 243(h) relief but was denied asylum:

"Section 243(h) relief is 'country specific' and accordingly, the applicant here would be presently protected from deportation to Afghanistan pursuant to section 243(h).   But that section would not prevent his exclusion and deportation to Pakistan or any other hospitable country under section 237(a) if that country will accept him.   In contrast, asylum is a greater form of relief.   When granted asylum the alien may be eligible for adjustment of status to that of a lawful permanent resident pursuant to section 209 of the Act, 8 U. S. C. 1159, after residing here one year, subject to

§ 243(h). See *Stevic*, 467 U. S., at 421, n. 15. Prior to 1968, the Attorney General had discretion whether to grant withholding of deportation to aliens under § 243(h). In 1968, however, the United States agreed to comply with the substantive provisions of Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees. See 19 U.S.T. 6223, 6259–6276, T.I.A.S. No. 6577 (1968); see generally *Stevic, supra*, at 416–417. Article 33.1 of the Convention, 189 U.N.T.S. 150, 176 (1954), reprinted in 19 U.S.T. 6259, 6276, which is the counterpart of § 243(h) of our statute, imposed a mandatory duty on contracting States not to return an alien to a country where his "life or freedom would be threatened" on account of one of the enumerated reasons.[7] See *infra*, at 441. Thus, although § 243(h) itself did not constrain the Attorney General's discretion after 1968, presumably he honored the dictates of the United Nations Convention.[8] In any event, the 1980 Act removed the Attorney General's discretion in § 243(h) proceedings.[9]

---

numerical limitations and the applicable regulations." *Matter of Salim*, 18 I. & N. Dec. 311, 315 (1982).

See also *Matter of Lam*, 18 I. & N. Dec. 15, 18 (BIA 1981).

[7] Article 33.1 of the Convention provides: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 189 U.N.T.S. 150, 176 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968).

[8] While the Protocol constrained the Attorney General with respect to § 243(h) between 1968 and 1980, the Protocol does not *require* the granting of asylum to anyone, and hence does not subject the Attorney General to a similar constraint with respect to his discretion under § 208(a). See *infra*, at 440–441.

[9] As amended, the new § 243(h) provides: "The Attorney General *shall not* deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particu-

In *Stevic* we considered it significant that in enacting the 1980 Act Congress did not amend the standard of eligibility for relief under § 243(h). While the terms "refugee" and hence "well-founded fear" were made an integral part of the § 208(a) procedure, they continued to play no part in § 243(h). Thus we held that the prior consistent construction of § 243(h) that required an applicant for withholding of deportation to demonstrate a "clear probability of persecution" upon deportation remained in force. Of course, this reasoning, based in large part on the plain language of § 243(h), is of no avail here since § 208(a) expressly provides that the "well-founded fear" standard governs eligibility for asylum.

The Government argues, however, that even though the "well-founded fear" standard is applicable, there is no difference between it and the "would be threatened" test of § 243(h). It asks us to hold that the only way an applicant can demonstrate a "well-founded fear of persecution" is to prove a "clear probability of persecution." The statutory language does not lend itself to this reading.

To begin with, the language Congress used to describe the two standards conveys very different meanings. The "would be threatened" language of § 243(h) has no subjective component, but instead requires the alien to establish by objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation.[10] See *Stevic, supra.* In contrast, the reference to "fear" in the § 208(a) standard obviously makes the eligibility determination turn to some extent on the subjective mental state of the

---

lar social group, or political opinion." 8 U. S. C. § 1253(h)(1) (emphasis added).

[10] "The section literally provides for withholding of deportation only if the alien's life or freedom 'would' be threatened in the country to which he would be deported; it does not require withholding if the alien 'might' or 'could' be subject to persecution." *Stevic,* 467 U. S., at 422.

lien.[11] "The linguistic difference between the words 'well-ounded fear' and 'clear probability' may be as striking as that )etween a subjective and an objective frame of reference. . . We simply cannot conclude that the standards are identi-:al." *Guevara-Flores* v. *INS*, 786 F. 2d 1242, 1250 (CA5 l986), cert. pending, No. 86–388; see also *Carcamo-Flores* v. *INS*, 805 F. 2d 60, 64 (CA2 1986); 767 F. 2d, at 1452 (case )elow).

That the fear must be "well-founded" does not alter the obvious focus on the individual's subjective beliefs, nor does it transform the standard into a "more likely than not" one. One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place. As one leading authority has pointed out:

> "Let us . . . presume that it is known that in the applicant's country of origin every tenth adult male person is either put to death or sent to some remote labor camp. . . . In such a case it would be only too apparent that anyone who has managed to escape from the country in question will have 'well-founded fear of being persecuted' upon his eventual return." 1 A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966).

This ordinary and obvious meaning of the phrase is not to be lightly discounted. See *Russello* v. *United States*, 464 U. S. 16, 21 (1983); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 198–199 (1976). With regard to this very statutory scheme, we have considered ourselves bound to "'assume "that ,the legislative purpose is expressed by the ordinary meaning of the words used."'" *INS* v. *Phinpathya*, 464 U. S. 183, 189 (1984) (quoting *American Tobacco Co.* v. *Patterson*, 456

---

[11] The BIA agrees that the term "fear," as used in this statute, refers to "a subjective condition, an emotion characterized by the anticipation or awareness of danger." *Matter of Acosta*, Interim Decision No. 2986, p. 14 (Mar. 1, 1985) (citing Webster's Third New International Dictionary 831 (16th ed. 1971)).

U. S. 63, 68 (1982), in turn quoting *Richards* v. *United States*, 369 U. S. 1, 9 (1962)).

The different emphasis of the two standards which is so clear on the face of the statute is significantly highlighted by the fact that the same Congress simultaneously drafted § 208(a) and amended § 243(h). In doing so, Congress chose to maintain the old standard in § 243(h), but to incorporate a different standard in § 208(a). "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello* v. *United States, supra,* at 23 (quoting *United States* v. *Wong Kim Bo,* 472 F. 2d 720, 722 (CA5 1972)). The contrast between the language used in the two standards, and the fact that Congress used a new standard to define the term "refugee," certainly indicate that Congress intended the two standards to differ.

## III

The message conveyed by the plain language of the Act is confirmed by an examination of its history.[12] Three aspects of that history are particularly compelling: The pre-1980 experience under § 203(a)(7), the only prior statute dealing with asylum; the abundant evidence of an intent to conform the definition of "refugee" and our asylum law to the United Nations Protocol to which the United States has been bound

---

[12] As we have explained, the plain language of this statute appears to settle the question before us. Therefore, we look to the legislative history to determine only whether there is "clearly expressed legislative intention" contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses. See *United States* v. *James,* 478 U. S. 597, 606 (1986); *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980). In this case, far from causing us to question the conclusion that flows from the statutory language, the legislative history adds compelling support to our holding that Congress never intended to restrict eligibility for asylum to aliens who can satisfy § 243(h)'s strict, objective standard.

since 1968; and the fact that Congress declined to enact the Senate version of the bill that would have made a refugee ineligible for asylum unless "his deportation or return would be prohibited by § 243(h)."

*The Practice Under § 203(a)(7).*

The statutory definition of the term "refugee" contained in § 101(a)(42) applies to two asylum provisions within the Immigration and Nationality Act.[13]   Section 207, 8 U. S. C. § 1157, governs the admission of refugees who seek admission from foreign countries.   Section 208, 8 U. S. C. § 1158, sets out the process by which refugees currently in the United States may be granted asylum.   Prior to the 1980 amendments there was no statutory basis for granting asylum to aliens who applied from within the United States.[14]   Asylum for aliens applying for admission from foreign countries had, however, been the subject of a previous statutory provision, and Congress' intent with respect to the changes that it sought to create in that statute are instructive in discerning the meaning of the term "well-founded fear."

Section § 203(a)(7) of the pre-1980 statute authorized the Attorney General to permit "conditional entry" to a certain number of refugees fleeing from Communist-dominated areas or the Middle East "because of persecution or fear of persecution on account of race, religion, or political opinion."   79

---

[13] The definition also applies to § 209, 8 U. S. C. § 1159, which governs the adjustment of status of refugees after they have been granted asylum.

[14] Such a procedure had been authorized by regulation since 1974, see 8 CFR pt. 108 (1976), but it was administered by INS District Directors rather than the BIA.   As we noted in *Stevic*, these "regulations did not explicitly adopt a standard for the exercise of discretion on the application, but did provide that a denial of an asylum application 'shall not preclude the alien, in a subsequent expulsion hearing, from applying for the benefits of section 243(h) of the Act and of Articles 32 and 33 of the Convention Relating to the Status of Refugees.' 8 CFR § 108.2 (1976)." 467 U. S., at 420, n. 13.   In 1979, the regulations were amended to confer jurisdiction over asylum requests on the BIA for the first time.   *Ibid.*

Stat. 913, 8 U. S. C. § 1153(a)(7) (1976 ed.). The standard that was applied to aliens seeking admission pursuant to § 203(a)(7) was unquestionably more lenient than the "clear probability" standard applied in § 243(h) proceedings. In *Matter of Tan*, 12 I. & N. Dec. 564, 569–570 (1967), for example, the BIA "found no support" for the argument that "an alien deportee is required to do no more than meet the standards applied under section 203(a)(7) of the Act when seeking relief under section 243(h)." Similarly, in *Matter of Adamska*, 12 I. & N. Dec. 201, 202 (1967), the Board held that an alien's inability to satisfy § 243(h) was not determinative of her eligibility under the "substantially broader" standards of § 203(a)(7). One of the differences the Board highlighted between the statutes was that § 243(h) requires a showing that the applicant "would be" subject to persecution, while § 203(a)(7) only required a showing that the applicant was unwilling to return "because of *persecution or fear of persecution.*" 12 I. & N., at 202 (emphasis in original). In sum, it was repeatedly recognized that the standards were significantly different.[15]

At first glance one might conclude that this wide practice under the old § 203(a)(7), which spoke of "fear of persecution," is not probative of the meaning of the term "well-founded fear of persecution" which Congress adopted in 1980. Analysis of the legislative history, however, demonstrates that Congress added the "well-founded" language only because that was the language incorporated by the United Nations Protocol to which Congress sought to conform. See *infra*, at 436–437. Congress was told that the extant asylum proce-

---

[15] See also *Matter of Janus and Janek*, 12 I. & N. Dec. 866, 876 (BIA 1968). On the District Director level, where § 203(a)(7) claims were generally processed, see n. 14, *supra*, this distinction was also recognized. In *Matter of Ugricic*, 14 I. & N. Dec. 384 (1972), a District Director articulated the test under § 203(a)(7) as whether the applicant could prove that "he was persecuted or had good reason to fear persecution." *Id.*, at 385–386.

dure for refugees outside of the United States was acceptable under the Protocol, except for the fact that it made various unacceptable geographic and political distinctions.[16] The legislative history indicates that Congress in no way wished to modify the standard that had been used under § 203(a)(7).[17]

[16] See S. Rep. No. 96–256, p. 9 (1979) (hereafter S. Rep.) (substantive standard for asylum is not changed); H. R. Rep. No. 96–608, p. 9 (1979) (hereafter H. R. Rep.) (discussing geographic limitations); Hearings before the House Subcommittee on International Operations of the Committee on Foreign Affairs on H. R. 2816, 96th Cong., 1st Sess., 72 (1979) (remarks of David Martin).

[17] The INS argues that Congress intended to perpetuate the standard being used in the informal parole proceedings under the regulations, see n. 14, *supra,* not the asylum procedure under § 203(a)(7). Until 1979 the regulations provided no standard, but they were amended in 1979 to provide that the applicant has the "burden of satisfying the immigration judge that he would be subject to persecution." 8 CFR § 108.3(a) (1980). This standard was identical to the one that was set forth in the regulations for the treatment of applications for withholding of deportation. See 8 CFR § 242.17(c) (1980).

The argument that Congress intended to adhere to the standard used in the informal parole proceedings cannot be squared with Congress' use of an entirely different formulation of the standard for defining "refugee"—one much closer to § 203(a)(7), than to § 243(h) (the statute which was the focus of the standard developed in the 1980 regulations). Moreover, to the extent that Congress was ambiguous as to which practice it sought to incorporate, it is far more reasonable to conclude that it sought to continue the practice under § 203(a)(7), a statutory provision, than to adhere to the informal parole practices of the Attorney General, a matter in which Congress had no involvement.

The Government relies on the following passage from the Senate Report to support its contention that Congress sought to incorporate the standard from the parole proceedings—not from § 203(a)(7):

"[T]he bill establishes an asylum provision in the Immigration and Nationality Act for the first time by improving and clarifying the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed." S. Rep., at 9.

The bill that the Senate Committee was discussing indeed made no change in the standards to be applied to applications for asylum from aliens within the United States; the Senate version explicitly incorporated the same standard as used in § 243(h). See *infra,* at 441–442. But the Senate ver-

Adoption of the INS's argument that the term "well-founded fear" requires a showing of clear probability of persecution would clearly do violence to Congress' intent that the standard for admission under § 207 be no different than the one previously applied under § 203(a)(7).[18]

*The United Nations Protocol.*

If one thing is clear from the legislative history of the new definition of "refugee," and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States

---

sion was rejected by Congress, and the well-founded fear standard that was adopted mirrored § 203(a)(7), not § 243(h).

JUSTICE POWELL's claim that the House Report also sought to incorporate the informal asylum standard is unfounded. *Post*, at 462–463. As the passage he quotes and the context plainly indicate, the House Report referred to "means of entry"—an issue dealt with under § 203(a)(7), not the asylum regulations. See H. R. Rep., at 10. The Committee's reference to the Attorney General's asylum procedures, seven pages later in the text, in a discussion labeled "Asylum," and not even dealing with the definition of "well-founded fear," see *id.*, at 17, certainly does nothing to support JUSTICE POWELL's conclusion.

[18] Although this evidence concerns application of the term "refugee" to § 207, not § 208, the term is defined in § 101(a)(42), and obviously can have only one meaning. JUSTICE POWELL suggests that the definition of "well-founded fear" be interpreted as incorporating the standard from the asylum regulations, rather than the standard from § 203(a)(7), because "[i]t is more natural to speak of 'preserving' an interpretation that had governed the *same* form of relief than one that had applied to a *different* form of relief," *post*, at 462 (emphasis added). Since the definition in § 101(a)(42) applies to all asylum relief—that corresponding to the old § 203(a)(7) as well as that corresponding to the old Attorney General regulations—it is difficult to understand how JUSTICE POWELL reasons that it is likely that Congress preserved the "*same* form of relief" (emphasis added). The question is: the "same" as which? Our answer, based on Congress' choice of language and the legislative history, is that Congress sought to incorporate the "same" standard as that used in § 203(a)(7).

acceded in 1968.[19]   Indeed, the definition of "refugee" that Congress adopted, see *supra*, at 428, is virtually identical to the one prescribed by Article 1(2) of the Convention which defines a "refugee" as an individual who

> "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it."

Compare 19 U.S.T. 6225 with 19 U.S.T. 6261.   Not only did Congress adopt the Protocol's standard in the statute, but there were also many statements indicating Congress' intent that the new statutory definition of "refugee" be interpreted in conformance with the Protocol's definition.   The Conference Committee Report, for example, stated that the definition was accepted "with the understanding that it is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol." S. Rep. No. 96–590, p. 20 (1980); see also H. R. Rep., at 9. It is thus appropriate to consider what the phrase "well-founded fear" means with relation to the Protocol.

The origin of the Protocol's definition of "refugee" is found in the 1946 Constitution of the International Refugee Organization (IRO).   See 62 Stat. 3037.   The IRO defined a "refugee" as a person who had a "valid objection" to returning to his country of nationality, and specified that "fear, based on reasonable grounds of persecution because of race, religion, nationality, or political opinions . . ." constituted a valid objection.   See IRO Constitution, Annex 1, Pt. 1, § C1(a)(i). The term was then incorporated in the United Nations Con-

---

[19] See H. R. Conf. Rep. No. 96–781, p. 19 (1980); H. R. Rep., at 9; S. Rep., at 4.

vention Relating to the Status of Refugees,[20] 189 U.N.T.S. 150 (July 28, 1951). The Committee that drafted the provision explained that "[t]he expression 'well-founded fear of being the victim of persecution . . .' means that a person has either been actually a victim of persecution or can show good reason why he fears persecution." U. N. Rep., at 39. The 1967 Protocol incorporated the "well-founded fear" test, without modification. The standard, as it has been consistently understood by those who drafted it, as well as those drafting the documents that adopted it, certainly does not require an alien to show that it is more likely than not that he will be persecuted in order to be classified as a "refugee."[21]

In interpreting the Protocol's definition of "refugee" we are further guided by the analysis set forth in the Office of the

---

[20] In the Displaced Persons Act of 1948, 62 Stat. 1009, §§ 2(a), (d), Congress adopted the IRO definition of the term "refugee" and thus used the "fear of persecution" standard. This standard was retained in the Refugee Relief Act of 1953, 67 Stat. 400 § 2(a), as well as in the Refugee Escapee Act of 1957, 71 Stat. 643 § 15(c)(1). In 1965, when Congress enacted § 203(a)(7) of the Act, it again used the "fear of persecution" standard.

The interpretation afforded to the IRO definition is important in understanding the United Nations' definition since the Committee drafting the United Nations' definition made it clear that it sought to "assure that the new consolidated convention should afford at least as much protection to refugees as had been provided by previous agreements." United Nations Economic and Social Council, Report of the Ad Hoc Committee on Statelessness and Related Problems 37 (Feb. 17, 1950) (U. N. Doc. E/1618, E/AC.32/5 (hereafter U. N. Rep.)). In its Manual for Eligibility Officers, the IRO had stated:

"Fear of persecution is to be regarded as a valid objection whenever an applicant can make plausible that owing to his religious or political convictions or to his race, he is afraid of discrimination, or persecution, on returning home. Reasonable grounds are to be understood as meaning that the applicant can give a plausible and coherent account of why he fears persecution." International Refugee Organization, Manual for Eligibility Officers No. 175, ch. IV, Annex 1, Pt. 1, § C19, p. 24 (undated, circulated in 1950).

[21] Although the United States has never been party to the 1951 Convention, it is a party to the Protocol, which incorporates the Convention's definition in relevant part. See 19 U.S.T. 6225, T.I.A.S. No. 6577 (1968).

United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979).[22] The Handbook explains that "[i]n general, the applicant's fear should be considered well founded if he can establish, to a reasonable degree, that his continued stay in his country of origin has become intolerable to him for the reasons stated in the definition, or would for the same reasons be intolerable if he returned there." *Id.*, at Ch. II B(2)(a) § 42; see also *id.*, §§ 37–41.

The High Commissioner's analysis of the United Nations' standard is consistent with our own examination of the origins of the Protocol's definition,[23] as well as the conclusions of

---

[22] We do not suggest, of course, that the explanation in the U. N. Handbook has the force of law or in any way binds the INS with reference to the asylum provisions of § 208(a). Indeed, the Handbook itself disclaims such force, explaining that "the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself." Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 1 (ii) (Geneva, 1979).

Nonetheless, the Handbook provides significant guidance in construing the Protocol, to which Congress sought to conform. It has been widely considered useful in giving content to the obligations that the Protocol establishes. See *McMullen* v. *INS*, 658 F. 2d 1312, 1319 (CA9 1981); *Matter of Frentescu*, 18 I. & N. Dec. 244 (BIA 1982); *Matter of Rodriguez-Palma*, 17 I. & N. Dec. 465 (BIA 1980).

[23] The Board's decision in *Matter of Dunar*, 14 I. & N. Dec. 310 (1973), is not particularly probative of what the Protocol means and how it interacts with the provisions of the 1980 Act. In *Dunar*, the Board was faced with the question whether the United States' accession to the Protocol modified the standard of proof to be applied under § 243(h). The Board, after elaborating on the principle that treaties are not lightly to be read as superseding prior Acts of Congress, *id.*, at 313–314, found no evidence that Congress sought to modify the § 243(h) standard, and therefore construed the provisions as not inherently inconsistent. Even so, the Board recognized some tension between the standards, but was satisfied that they could "be reconciled on a case-by-case consideration as they arise." *Id.*, at 321.

Whether or not the Board was correct in *Dunar*, its holding based on a presumption that the two provisions were consistent says little about how the Protocol should be interpreted absent such a presumption, and given Congress' amendment of the statute to make it conform with the Pro-

many scholars who have studied the matter.[24]   There is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no "well-founded fear" of the event happening.   See *supra*, at 431.   As we pointed out in *Stevic*, a moderate interpretation of the "well-founded fear" standard would indicate "that so long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility."   467 U. S., at 424–425.

In *Stevic*, we dealt with the issue of withholding of deportation, or *nonrefoulement*, under § 243(h).   This provision corresponds to Article 33.1 of the Convention.[25]   Significantly though, Article 33.1 does not extend this right to everyone who meets the definition of "refugee."   Rather, it provides that "[n]o Contracting State shall expel or return ('refouler') a *refugee* in any manner whatsoever to the frontiers or territories *where his life or freedom would be threatened* on account of his race, religion, nationality, membership or a particular social group or political opinion."   19 U.S.T., at 6276, 189 U.N.T.S., at 176 (emphasis added).   Thus, Article 33.1 requires that an applicant satisfy two burdens: first, that he or she be a "refugee," *i. e.*, prove at least a "well-

tocol.   See *Carvajal-Munoz*, 743 F. 2d, at 574 (distinguishing pre-1980 "prediction" about the relation of the standards with post-1980 analysis of Congress' actual intent).

[24] See 1 A. Grahl-Madsen, The Status of Refugees in International Law 181 (1966) ("If there is a real chance that he will suffer persecution, that is reason good enough, and his 'fear' is 'well-founded' "); G. Goodwin-Gill, The Refugee in International Law 22–24 (1983) (balance of probability test is inappropriate; more appropriate test is "reasonable chance," "substantial grounds for thinking," or "serious possibility"); see generally Cox, "Well-Founded Fear of Being Persecuted": The Sources and Application of a Criterion of Refugee Status, 10 Brooklyn J. Int'l Law 333 (1984).

[25] The 1980 Act made withholding of deportation under § 243(h) mandatory in order to comply with Article 33.1.   See *supra*, at 428–429.

founded fear of persecution"; second, that the "refugee" show that his or her life or freedom "would be threatened" if deported. Section 243(h)'s imposition of a "would be threatened" requirement is entirely consistent with the United States' obligations under the Protocol.

Section 208(a), by contrast, is a discretionary mechanism which gives the Attorney General the *authority* to grant the broader relief of asylum to refugees. As such, it does not correspond to Article 33 of the Convention, but instead corresponds to Article 34. See *Carvajal-Munoz*, 743 F. 2d, at 574, n. 15. That Article provides that the contracting States "shall as far as possible facilitate the assimilation and naturalization of refugees. . . ." Like § 208(a), the provision is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible. Also like § 208(a), an alien must only show that he or she is a "refugee" to establish eligibility for relief. No further showing that he or she "would be" persecuted is required.

Thus, as made binding on the United States through the Protocol, Article 34 provides for a precatory, or discretionary, benefit for the entire class of persons who qualify as "refugees," whereas Article 33.1 provides an entitlement for the subcategory that "would be threatened" with persecution upon their return. This precise distinction between the broad class of refugees and the subcategory entitled to § 243(h) relief is plainly revealed in the 1980 Act. See *Stevic*, 467 U. S., at 428, n. 22.

*Congress' Rejection of S. 643.*

Both the House bill, H. R. 2816, 96th Cong., 1st Sess. (1979), and the Senate bill, S. 643, 96th Cong., 1st Sess. (1979), provided that an alien must be a "refugee" within the meaning of the Act in order to be eligible for asylum. The two bills differed, however, in that the House bill authorized the Attorney General, in his discretion, to grant asylum to any refugee, whereas the Senate bill imposed the additional

requirement that a refugee could not obtain asylum unless "his deportation or return would be prohibited under section 243(h)."[26] S. Rep., at 26. Although this restriction, if adopted, would have curtailed the Attorney General's discretion to grant asylum to refugees pursuant to § 208(a), it would not have affected the standard used to determine whether an alien is a "refugee." Thus, the inclusion of this prohibition in the Senate bill indicates that the Senate recognized that there is a difference between the "well-founded fear" standard and the clear-probability standard.[27] The enactment of the House bill rather than the Senate bill in turn demonstrates that Congress eventually refused to restrict eligibility for asylum only to aliens meeting the stricter standard. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub*

---

[26] Section 207(b)(1) of the Senate bill provided: "The Attorney General shall establish a uniform procedure for an alien physically present in the United States, irrespective of his status, to apply for asylum, and the alien shall be granted asylum if he is a refugee within the meaning of section 101(a)(42)(A) and his deportation or return would be prohibited under section 243(h) of this Act." See S. Rep., at 26.

[27] The 1980 Act was the culmination of a decade of legislative proposals for reform in the refugee laws. See generally Anker & Posner, The Forty Year Crisis: A Legislative History of the Refugee Act of 1980, 19 San Diego L. Rev. 9, 20–64 (1981). On a number of occasions during that period, the Government objected to the "well-founded fear" standard, arguing: "[I]t should be limited by providing that it be a 'well-founded fear in the opinion of the Attorney General.' Failure to add 'in the opinion of the Attorney General' would make it extremely difficult to administer this section since it would be entirely subjective." Western Hemisphere Immigration, Hearings on H. R. 981 before Subcommittee No. 1 of the Committee on the Judiciary, 93d Cong., 1st Sess., 95 (1973) (statement of Hon. Francis Kellogg, Special Assistant to the Secretary of State). See also Anker & Posner, *supra*, at 25; Helton, Political Asylum Under the 1980 Refugee Act: An Unfulfilled Promise, 10 Mich. J. L. Ref. 243, 249–252 (1984). In light of this kind of testimony and attention to the issue, it is unrealistic to suggest that Congress did not realize that the "well-founded fear" standard was significantly different from the standard that has continuously been part of § 243(h).

*silentio* to enact statutory language that it has earlier discarded in favor of other language." *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 392–393 (1980) (Stewart, J., dissenting); cf. *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 200 (1974); *Russello* v. *United States*, 464 U. S., at 23.

IV

The INS makes two major arguments to support its contention that we should reverse the Court of Appeals and hold that an applicant can only show a "well-founded fear of persecution" by proving that it is more likely than not that he or she will be persecuted. We reject both of these arguments: the first ignores the structure of the Act; the second misconstrues the federal courts' role in reviewing an agency's statutory construction.

First, the INS repeatedly argues that the structure of the Act dictates a decision in its favor, since it is anomalous for § 208(a), which affords greater benefits than § 243(h), see n. 6, *supra*, to have a less stringent standard of eligibility. This argument sorely fails because it does not take into account the fact that an alien who satisfies the applicable standard under § 208(a) does not have a *right* to remain in the United States; he or she is simply *eligible* for asylum, if the Attorney General, in his discretion, chooses to grant it. An alien satisfying § 243(h)'s stricter standard, in contrast, is automatically entitled to withholding of deportation.[28] In *Matter of Salim*, 18 I. & N. Dec. 311 (1982), for example, the Board held that the alien was eligible for both asylum and withholding of deportation, but granted him the more limited remedy only, exercising its discretion to deny him asylum. See also *Walai* v. *INS*, 552 F. Supp. 998 (SDNY 1982); *Mat-*

---

[28] There are certain exceptions, not relevant here. See, *e. g.*, § 243(h)(2)(A) (alien himself participated in "the persecution of any person . . ."); § 243(h)(2)(B) (alien was convicted of "serious crime" and "constitutes a danger to the community of the United States").

*ter of Shirdel*, Interim Decision No. 2958 (BIA Feb. 21, 1984). We do not consider it at all anomalous that out of the entire class of "refugees," those who can show a clear probability of persecution are *entitled* to mandatory suspension of deportation and *eligible* for discretionary asylum, while those who can only show a well-founded fear of persecution are not *entitled* to anything, but are *eligible* for the discretionary relief of asylum.

There is no basis for the INS's assertion that the discretionary/mandatory distinction has no practical significance. Decisions such as *Matter of Salim, supra*, and *Matter of Shirdel, supra*, clearly demonstrate the practical import of the distinction. Moreover, the 1980 Act amended § 243(h) for the very purpose of changing it from a discretionary to a mandatory provision. See *supra*, at 428–429. Congress surely considered the discretionary/mandatory distinction important then, as it did with respect to the very definition of "refugee" involved here. The House Report provides:

> "The Committee carefully considered arguments that the new definition might expand the numbers of refugees eligible to come to the United States and force substantially greater refugee admissions than the country could absorb. However, merely because an individual or group comes within the definition will not guarantee resettlement in the United States." H. R. Rep., at 10.

This vesting of discretion in the Attorney General is quite typical in the immigration area, see, *e. g., INS* v. *Jong Ha Wang*, 450 U. S. 139 (1981). If anything is anomalous, it is that the Government now asks us to restrict its discretion to a narrow class of aliens. Congress has assigned to the Attorney General and his delegates the task of making these hard individualized decisions; although Congress could have crafted a narrower definition, it chose to authorize the At-

torney General to determine which, if any, eligible refugees should be denied asylum.

The INS's second principal argument in support of the proposition that the "well-founded fear" and "clear probability" standard are equivalent is that the BIA so construes the two standards. The INS argues that the BIA's construction of the Refugee Act of 1980 is entitled to substantial deference, even if we conclude that the Court of Appeals' reading of the statutes is more in keeping with Congress' intent.[29] This argument is unpersuasive.

---

[29] In view of the INS's heavy reliance on the principle of deference as described in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), we set forth the relevant text in its entirety:

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

" 'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' *Morton* v. *Ruiz*, 415 U. S. 199, 231 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

"We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is

The question whether Congress intended the two standards to be identical is a pure question of statutory construction for the courts to decide. Employing traditional tools of statutory construction, we have concluded that Congress did not intend the two standards to be identical.[30] In *Chevron*

entrusted to administer, and the principle of deference to administrative interpretations

" 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. . . .

" '. . . If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' *United States* v. *Shimer*, 367 U. S. 374, 382, 383 (1961).

"Accord, *Capital Cities Cable, Inc.* v. *Crisp*, [467 U. S. 691, 699–700 (1984)].

"In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program, the question before it was not whether in its view the concept is 'inappropriate' in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one. Based on the examination of the legislation and its history which follows, we agree with the Court of Appeals that Congress did not have a specific intention on the applicability of the bubble concept in these cases, and conclude that the EPA's use of that concept here is a reasonable policy choice for the agency to make." *Id.*, at 842–845 (citations and footnotes omitted).

[30] An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years. An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view. *Watt* v. *Alaska*, 451 U. S. 259, 273 (1981); see also *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 143 (1976).

*U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), we explained:

"The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional

The BIA has answered the question of the relationship between the objective § 243(h) standard and the fear-based standard of §§ 203(a)(7), 208, and the United Nations Protocol in at least three different ways. During the period between 1965, when § 203(a)(7) was enacted, and 1972, the BIA expressly recognized that § 203(a)(7) and § 243(h) prescribed different standards. See *supra*, at 433–434. Moreover, although the BIA decided in 1973 that the two standards were not irreconcilably different, see *Matter of Dunar*, 14 I. & N. Dec. 310 (1973), as of 1981 the INS was still instructing its officials to apply a "good reason" test to requests for asylum from aliens not within the United States. See Dept. of Justice, INS Operating Instructions Regulations TM 101, § 208.4, p. 766.9 (Nov. 11, 1981) (explaining that "well-founded fear" is satisfied if applicant "can show good reason why he/she fears persecution"). In 1984, when this case was decided by the BIA, it adhered to the view that the INS now espouses — complete identity of the standards. In 1985, however, the BIA decided to reevaluate its position and issued a comprehensive opinion to explain its latest understanding of the "well-founded fear" standard. *Matter of Acosta*, Interim Decision No. 2986 (Mar. 1, 1985).

In *Acosta*, the BIA noted a number of similarities between the two standards and concluded that in practical application they are "comparable" or "essentially comparable," and that the differences between them are not "meaningful," but the agency never stated that they are identical, equivalent, or interchangeable. On the contrary, the *Acosta* opinion itself establishes that the two standards differ. In describing the objective component of the asylum standard, the BIA concluded that the alien is not required to establish the likelihood of persecution to any "particular degree of certainty." *Id.*, at 22. There must be a "real chance" that the alien will become a victim of persecution, *ibid.*, but it is not necessary to show "that persecution 'is more likely than not' to occur." *Id.*, at 25. The *Acosta* opinion was written after we had decided in *Stevic* that the § 243(h) standard "requires that an application be supported by evidence establishing that it is more likely than not that the alien would be subject to persecution," 467 U. S., at 429–430. The decision in *Acosta* and the long pattern of erratic treatment of this issue make it apparent that the BIA has not consistently agreed, and even today does not completely agree, with the INS's litigation position that the two standards are equivalent.

intent. [Citing cases.] If a court, employing tradi-
tional tools of statutory construction, ascertains that
Congress had an intention on the precise question at
issue, that intention is the law and must be given effect."
*Id.*, at 843, n. 9 (citations omitted).

The narrow legal question whether the two standards are
the same is, of course, quite different from the question of in-
terpretation that arises in each case in which the agency is
required to apply either or both standards to a particular set
of facts. There is obviously some ambiguity in a term like
"well-founded fear" which can only be given concrete mean-
ing through a process of case-by-case adjudication. In that
process of filling "'any gap left, implicitly or explicitly, by
Congress,'" the courts must respect the interpretation of the
agency to which Congress has delegated the responsibility
for administering the statutory program. See *Chevron,
supra*, at 843, quoting *Morton* v. *Ruiz*, 415 U. S. 199, 231
(1974). But our task today is much narrower, and is well
within the province of the Judiciary. We do not attempt to
set forth a detailed description of how the "well-founded fear"
test should be applied.[31] Instead, we merely hold that the
Immigration Judge and the BIA were incorrect in holding
that the two standards are identical.[32]

---

[31] How "meaningful" the differences between the two standards may be
is a question that cannot be fully decided in the abstract, but the fact that
Congress has prescribed two different standards in the same Act certainly
implies that it intended them to have significantly different meanings.

We cannot accept the INS's argument that it is impossible to think
about a "well-founded fear" except in "more likely than not" terms. The
Board was able to do it for a long time under § 203(a)(7), see *Matter of
Tan*, 12 I. & N. Dec. 564 (1967); *Matter of Adamska*, 12 I. & N. Dec. 201
(1967), and has apparently had little trouble applying the two separate
standards in compliance with the recent Courts of Appeals' decisions.
See, *e. g.*, *Matter of Sanchez and Escobar*, Interim Decision No. 2996 (Oct.
15, 1985).

[32] JUSTICE POWELL argues that the Court of Appeals should be reversed
for a different reason—that it misinterpreted the BIA's decision. See

Our analysis of the plain language of the Act, its symmetry with the United Nations Protocol, and its legislative history, lead inexorably to the conclusion that to show a "well-founded fear of persecution," an alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country. We find these ordinary canons of statutory construction compelling, even without regard to the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien. See *INS* v. *Errico*, 385 U. S. 214, 225 (1966); *Costello* v. *INS*, 376 U. S. 120, 128 (1964); *Fong Haw Tan* v. *Phelan*, 333 U. S. 6, 10 (1948).

Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country. In enacting the Refugee Act of 1980 Congress sought to "give the United States sufficient flexibility to respond to situations involving political or religious dissidents and detainees throughout the world." H. R. Rep., at 9. Our holding today increases that flexibility by rejecting the Government's contention that the Attorney General may not even consider granting asylum to one who

---

*post*, at 465–468. This issue was not raised in any of the parties' briefs, and was neither "set forth" nor "fairly included" within the question presented in the petition for certiorari. See this Court's Rule 20.1. The question presented asked:

"Whether an alien's burden of proving eligibility for asylum pursuant to Section 208 (a) of the Immigration and Nationality Act of 1952, 8 U. S. C. 1158 (a), is equivalent to his burden of proving eligibility for withholding of deportation pursuant to Section 243 (h) of the Act, 8 U. S. C. 1253 (h)." Pet. for Cert. (I).

This question cannot be read as challenging the Court of Appeals' determination that the BIA in fact required respondent "to demonstrate a clear probability of persecution in order to be declared eligible for asylum." 767 F. 2d, at 1454. We therefore decline to address the issue. See *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56, 60, n. 2 (1981); *Irvine* v. *California*, 347 U. S. 128, 129.(1954).

fails to satisfy the strict § 243(h) standard.    Whether or not a "refugee" is eventually granted asylum is a matter which Congress has left for the Attorney General to decide.    But it is clear that Congress did not intend to restrict eligibility for that relief to those who could prove that it is more likely than not that they will be persecuted if deported.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion and judgment.    Thus, I accept its "narrow" conclusion that "the Immigration Judge and the BIA were incorrect in holding that the [standards for withholding of deportation and granting asylum] are identical." *Ante*, at 448.    In accordance with this holding, the Court eschews any attempt to give substance to the term "well-founded fear" and leaves that task to the "process of case-by-case adjudication" by the INS, the agency in charge of administering the immigration laws.    *Ibid.*    I write separately and briefly to emphasize my understanding that, in its opinion, the Court has directed the INS to the appropriate sources from which the agency should derive the meaning of the "well-founded fear" standard, a meaning that will be refined in later adjudication.    This emphasis, I believe, is particularly needed where, as here, an agency's previous interpretation of the statutory term is so strikingly contrary to plain language and legislative history.

Thus, as the Court observes, *ante*, at 430–431, the very language of the term "well-founded fear" demands a particular type of analysis — an examination of the subjective feelings of an applicant for asylum coupled with an inquiry into the objective nature of the articulated reasons for the fear. Moreover, in describing how, in the 1980 Act, Congress was attempting to bring this country's refugee laws into conformity with the United Nations Protocol, the Court notes that the Act's definition of refugee, wherein the "well-founded fear" term appears, *ante*, at 427, tracks the language of the

Protocol. See *ante*, at 436–437. Such language has a rich history of interpretation in international law and scholarly commentaries. See *ante*, at 437–440, and nn. 20, 24. While the INS need not ignore other sources of guidance, the above directions by the Court should be significant in the agency's formulation of the "well-founded fear" standard.

Finally, in my view, the well-reasoned opinions of the Courts of Appeals, that almost uniformly have rejected the INS's misreading of statutory language and legislative history, provide an admirable example of the very "case-by-case adjudication" needed for the development of the standard. Although the Court refers to a conflict among these courts, see *ante*, at 426, n. 2, with one exception, see *ibid.*, *all* the Courts of Appeals that have addressed this question have concluded that the standards for withholding of deportation and granting asylum are not the same. Rather, differences in opinion have arisen as to the precise formulation of the "well-founded fear" standard.* Such differences can arise only when courts or agencies seriously grapple with the problems of developing a standard, whose form is at first given by the statutory language and the intimations of the legislative

---

*See, *e. g.*, *Carcamo-Flores* v. *INS*, 805 F. 2d 60, 68 (CA2 1986) ("What is relevant is the fear a reasonable person would have, keeping in mind the context of a reasonable person who is facing the possibility of persecution, perhaps including a loss of freedom or even, in some cases, the loss of life"); *Guevara-Flores* v. *INS*, 786 F. 2d 1242, 1249 (CA5 1986), cert. pending, No. 86–388 ("An alien possesses a well-founded fear of persecution if a reasonable person in her circumstances would fear persecution if she were to be returned to her native country"); *Cardoza-Fonseca* v. *INS*, 767 F. 2d 1448, 1452–1453 (CA9 1985) (case below) ("In contrast, the term 'well-founded fear' requires that (1) the alien have a subjective fear, and (2) that this fear have enough of a basis that it can be considered well-founded"); *Carvajal-Munoz* v. *INS*, 743 F. 2d 562, 574 (CA7 1984) ("The applicant must present *specific* facts establishing that he or she has actually been the victim of persecution or has some other good reason to fear that he or she will be *singled out* for persecution on account of race, religion, nationality, membership in a particular social group, or political opinion") (emphasis in original).

history, but whose final contours are shaped by the application of the standard to the facts of specific cases. The efforts of these courts stand in stark contrast to—but, it is sad to say, alone cannot make up for—the years of seemingly purposeful blindness by the INS, which only now begins its task of developing the standard entrusted to its care.

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court that the plain meaning of "well-founded fear" and the structure of the Immigration and Nationality Act (Act) clearly demonstrate that the "well-founded fear" standard and the "clear probability" standard are not equivalent. I concur in the judgment rather than join the Court's opinion, however, for two reasons. First, despite having reached the above conclusion, the Court undertakes an exhaustive investigation of the legislative history of the Act. *Ante,* at 432–443. It attempts to justify this inquiry by relying upon the doctrine that if the legislative history of an enactment reveals a "'clearly expressed legislative intention' contrary to [the enactment's] language," the Court is required to "question the strong presumption that Congress expresses its intent through the language it chooses." *Ante,* at 432, n. 12. Although it is true that the Court in recent times has expressed approval of this doctrine, that is to my mind an ill-advised deviation from the venerable principle that if the language of a statute is clear, that language must be given effect—at least in the absence of a patent absurdity. See, *e. g., United States* v. *Wiltberger,* 5 Wheat. 76, 95–96 (1820) (opinion of Marshall, C. J.); *United States* v. *Hartwell,* 6 Wall. 385 (1868); *Bate Refrigerating Co.* v. *Sulzberger,* 157 U. S. 1, 34 (1895) (opinion of Harlan, J.); *Caminetti* v. *United States,* 242 U. S. 470, 485 (1917); *Packard Motor Car Co.* v. *NLRB,* 330 U. S. 485, 492 (1947) (opinion of Jackson, J.); *United States* v. *Sullivan,* 332 U. S. 689, 693 (1948) (opinion of Black, J.); *Unexcelled Chemical Corp.* v. *United States,* 345 U. S. 59, 64 (1953) (opinion of Douglas, J.). Judges interpret laws rather than reconstruct

legislators' intentions. Where the language of those laws is clear, we are not free to replace it with an unenacted legislative intent.

Even by its own lights, however, the Court's explication of the legislative history of the Act is excessive. The INS makes a number of specific arguments based upon the legislative history of the Act. It would have sufficed, it seems to me, for the Court to determine whether these specific arguments establish a "clearly expressed legislative intent" that the two standards be equivalent. I think it obvious that they do not, as apparently does the Court. That being so, there is simply no need for the lengthy effort to ascertain the import of the entire legislative history. And that effort is objectionable not only because it is gratuitous. I am concerned that it will be interpreted to suggest that similarly exhaustive analyses are generally appropriate (or, worse yet, required) in cases where the language of the enactment at issue is clear. I also fear that in this case the Court's conduct of that inquiry will be interpreted as a betrayal of its assurance that it does "not attempt to set forth a detailed description of how the well-founded fear test should be applied," *ante*, at 448. See, *e. g.*, *ante*, at 438–440 (appearing to endorse a particular interpretation of "well-founded fear").

I am far more troubled, however, by the Court's discussion of the question whether the INS's interpretation of "well-founded fear" is entitled to deference. Since the Court quite rightly concludes that the INS's interpretation is clearly inconsistent with the plain meaning of that phrase and the structure of the Act, see *ante*, at 431–432, 449, and n. 12, there is simply no need and thus no justification for a discussion of whether the interpretation is entitled to deference. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress" (footnote omitted)). Even more

unjustifiable, however, is the Court's use of this superfluous discussion as the occasion to express controversial, and I believe erroneous, views on the meaning of this Court's decision in *Chevron*. *Chevron* stated that where there is no "unambiguously expressed intent of Congress," *id.*, at 843, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency," *id.*, at 844. This Court has consistently interpreted *Chevron*—which has been an extremely important and frequently cited opinion, not only in this Court but in the Courts of Appeals—as holding that courts must give effect to a reasonable agency interpretation of a statute unless that interpretation is inconsistent with a clearly expressed congressional intent. See, *e. g.*, *Japan Whaling Assn.* v. *American Cetacean Soc.*, 478 U. S. 221, 233–234 (1986); *United States* v. *Fulton*, 475 U. S. 657, 666–667 (1986); *Hillsborough County, Florida* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 714 (1985); *Chemical Manufacturers Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 125, 126 (1985). The Court's discussion is flatly inconsistent with this well-established interpretation. The Court first implies that courts may substitute their interpretation of a statute for that of an agency whenever, "[e]mploying traditional tools of statutory construction," they are able to reach a conclusion as to the proper interpretation of the statute. *Ante*, at 446. But this approach would make deference a doctrine of desperation, authorizing courts to defer only if they would otherwise be unable to construe the enactment at issue. This is not an interpretation but an evisceration of *Chevron*.

The Court also implies that courts may substitute their interpretation of a statute for that of an agency whenever they face "a pure question of statutory construction for the courts to decide," *ante*, at 446, rather than a "question of interpretation [in which] the agency is required to apply [a legal standard] to a particular set of facts," *ante*, at 448.

No support is adduced for this proposition, which is contra-
dicted by the case the Court purports to be interpreting,
since in *Chevron* the Court deferred to the Environmental
Protection Agency's abstract interpretation of the phrase
"stationary source."

In my view, the Court badly misinterprets *Chevron*.
More fundamentally, however, I neither share nor under-
stand the Court's eagerness to refashion important principles
of administrative law in a case in which such questions are
completely unnecessary to the decision and have not been
fully briefed by the parties.

I concur in the judgment.

JUSTICE POWELL, with whom THE CHIEF JUSTICE and
JUSTICE WHITE join, dissenting.

Many people come to our country because they fear per-
secution in their homeland. Congress has provided two
forms of relief for such people: asylum, see Immigration and
Nationality Act of 1952, § 208(a), as added by 94 Stat. 105,
8 U. S. C. § 1158(a); and withholding of deportation, see 66
Stat. 212, § 243(h), as amended, 94 Stat. 107, 8 U. S. C.
§ 1253(h). The Board of Immigration Appeals (BIA) has con-
cluded that there is no practical distinction between the
objective proofs an alien must submit to be eligible for these
two forms of relief. The Court rejects this conclusion. Be-
cause I believe the BIA's interpretation of the statute is
reasonable, I dissent.

I

The Court's opinion seems to assume that the BIA has
adopted a rigorous mathematical approach to asylum cases,
requiring aliens to demonstrate an objectively quantifiable
risk of persecution in their homeland that is more than 50%.
The Court then argues that such a position is inconsistent
with the language and history of the Act. But this has never
been the BIA's position. Thus, it is useful to examine the
BIA's approach in some detail before evaluating the Court's

rejection of the BIA's approach. After all, the BIA is the tribunal with the primary responsibility for applying the Act and the greatest experience in doing so.

The BIA's interpretation of the statutory term "well-founded fear" appears in *Matter of Acosta,* Interim Decision No. 2986 (Mar. 1, 1985).[1] Under the BIA's analysis, an immigration judge evaluating an asylum application should begin by determining the underlying historical facts. The burden of persuasion rests on the applicant, who must establish the truth of these facts by a preponderance of the evidence. See *id.,* at 7 (citing, *inter alia,* 1A C. Gordon & H. Rosenfield, Immigration Law and Procedure § 5.10b, p. 5–121 (rev. ed. 1986)).

Once the immigration judge has decided what historical facts the applicant has demonstrated, he then decides whether those facts meet the definition of "refugee" set forth in § 101(a)(42)(A) of the Act, 8 U. S. C. § 1101(a)(42)(A). The major point of contention in this case concerns that section's requirement that the fear be "well-founded."[2] In

---

[1] The Court suggests that the BIA's interpretation of the "well-founded fear" standard has been "erratic." *Ante,* at 446–447, n. 30. An examination of the *relevant* BIA decisions leads to a contrary conclusion. The BIA first addressed the standard in *Matter of Dunar,* 14 I. & N. Dec. 310 (1973). In that case, the BIA considered the meaning of the term "well-founded fear" in the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 6225, T.I.A.S. No. 6577 (1968). When Congress inserted this language in the asylum provisions of the Act in 1980, the BIA interpreted the language to mean exactly the same thing as the language in the Protocol. *Matter of Acosta,* Interim Decision No. 2986 (Mar. 1, 1985). Thus, the BIA's position has never changed. The Court bases its characterization of the BIA's record on decisions applying the more lenient "fear" standard. If anything about these statutes is clear, it is that a "well-founded fear" is something more than a "fear." It is unfair to characterize the BIA's decisions as "erratic" when the agency was in fact interpreting two different standards.

[2] The BIA has interpreted the statutory definition to require proof of four elements: (i) the alien must have a "fear" of "persecution"; (ii) the fear must be "well-founded"; (iii) the persecution must be "on account of race,

*Acosta*, the BIA adhered to the interpretation of that language it had developed in *Matter of Dunar*, 14 I. & N. Dec. 310 (1973):

> " '[T]he requirement that the fear be "well-founded" rules out an apprehension which is purely subjective. . . . Some sort of showing must be made and this can ordinarily be done only by objective evidence. The claimant's own testimony as to the facts will sometimes be all that is available; *but the crucial question is whether the testimony, if accepted as true, makes out a realistic likelihood that he will be persecuted.*' " *Acosta, supra*, at 18–19 (quoting *Dunar, supra*, at 319) (emphasis added by *Acosta* Board).

The *Acosta* Board went on to caution:

> "By use of such words [as 'realistic likelihood'] we do not mean that 'a well-founded fear of persecution' requires an alien to establish to a particular degree of certainty, such as a 'probability' as opposed to a 'possibility,' that he will become a victim of persecution. Rather as a practical matter, what we mean can best be described as follows: the evidence must demonstrate that (1) the alien possesses a belief or characteristic a persecutor seeks to overcome in others by means of punishment of some sort; (2) the persecutor is already aware, or could easily become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and (4) the persecutor has the inclination to punish the alien." *Acosta, supra*, at 22.

Finally, the *Acosta* opinion compared this "realistic likelihood" standard to the "clear probability" standard applied to

---

religion, nationality, membership in a particular social group, or political opinion"; and (iv) the alien must be unable or unwilling to return to his homeland because of persecution or his well-founded fear of persecution. See *id.*, at 11.

applications for withholding of deportation. The BIA's comments are insightful:

> "One might conclude that 'a well-founded fear of persecution,' which requires a showing that persecution is likely to occur, refers to a standard that is different from 'a clear probability of persecution,' which requires a showing that persecution is 'more likely than not' to occur. As a practical matter, however, the facts in asylum and withholding cases do not produce clear-cut instances in which such fine distinctions can be meaningfully made. Our inquiry in these cases, after all, is not quantitative, *i. e.*, we do not examine a variety of statistics to discern to some theoretical degree the likelihood of persecution. Rather our inquiry is qualitative: we examine the alien's experiences and other external events to determine if they are of a kind that enable us to conclude the alien is likely to become the victim of persecution. In this context, we find no meaningful distinction between a standard requiring a showing that persecution is likely to occur and a standard requiring a showing that persecution is more likely than not to occur. . . . Accordingly, we conclude that the standards for asylum and withholding of deportation are not meaningfully different and, in practical application, converge." *Id.*, at 25.

In sum, contrary to the Court's apparent conclusion, the BIA does not contend that both the "well-founded fear" standard and the "clear probability" standard require proof of a 51% chance that the alien will suffer persecution if he is returned to his homeland. The BIA plainly eschews analysis resting on mathematical probabilities. Rather, the BIA has adopted a four-part test requiring proof of facts that demonstrate a realistic likelihood of persecution actually occurring. The heart of the *Acosta* decision is the BIA's empirical conclusion, based on its experience in adjudicating asylum applications, that if the facts establish such a basis for an alien's

fear, it rarely will make a difference whether the judge asks if persecution is "likely" to occur or "more likely than not" to occur. If the alien can establish such a basis, he normally will be eligible for relief under either standard.

## II

In Part II of its opinion, the Court examines the language of the Act. Section 243(h) provides that the Attorney General shall grant withholding of deportation to any country where "such alien's life or freedom would be threatened." 8 U. S. C. § 1253(h). . Section 208(a) provides that the Attorney General has discretion to grant asylum "if the Attorney General determines that such alien is a refugee." § 1158(a). The crucial language of § 101(a)(42)(A) of the Act, as added by 94 Stat. 102, defines a refugee as a person who has "a well-founded fear of persecution." § 1101(a)(42)(A). In the Court's view, this language all but disposes of the case. *Ante,* at 427–432.

With respect to the issue presented by this case, I find the language far more ambiguous than the Court does. Respondent contends that the BIA has fallen into error by equating the objective showings required under §§ 208(a) and 243(h). The Court notes that the language of § 208(a) differs from the language of § 243(h) in that it contemplates a partially subjective inquiry. From this premise, the Court moves with little explanation to the conclusion that the objective inquiries under the two sections necessarily are different.

In reaching this conclusion, the Court gives short shrift to the words "well-founded," that clearly require some objective basis for the alien's fear. The critical question presented by this case is whether the objective basis required for a fear of persecution to be "well-founded" differs *in practice* from the objective basis required for there to be a "clear probability" of persecution. Because both standards necessarily contemplate some objective basis, I cannot agree with the Court's

implicit conclusion that the statute resolves this question on its face. In my view, the character of evidence sufficient to meet these two standards is a question best answered by an entity familiar with the types of evidence and issues that arise in such cases. Congress limited eligibility for asylum to those persons whom "the Attorney General determines" to be refugees. See § 208(a), 8 U. S. C. § 1158(a). The Attorney General has delegated the responsibility for making these determinations to the BIA. That Board has examined more of these cases than any court ever has or ever can. It has made a considered judgment that the difference between the "well-founded" and the "clear probability" standards is of no practical import: that is, the evidence presented in asylum and withholding of deportation cases rarely, if ever, will meet one of these standards without meeting both. This is just the type of expert judgment—formed by the entity to whom Congress has committed the question—to which we should defer.

The Court ignores the practical realities recognized by the expert agency and instead concentrates on semantic niceties. It posits a hypothetical situation in which a government sought to execute every 10th adult male. In its view, fear of such executions would be "well-founded" even if persecution of a particular individual would not be "more likely than not" to occur. See *ante*, at 431. But this hypothetical is irrelevant; it addresses a mathematically demanding interpretation of "well-founded" that has no relation to the BIA's actual treatment of asylum applications. Nor does it address the validity of the BIA's judgment that evidence presenting this distinction will be encountered infrequently, if ever.

Common sense and human experience support the BIA's conclusion. Governments rarely persecute people by the numbers. It is highly unlikely that the evidence presented at an asylum or withholding of deportation hearing will demonstrate the mathematically specific risk of persecution posited by the Court's hypothetical. Taking account of the

types of evidence normally available in asylum cases, the BIA has chosen to make a *qualitative* evaluation of "realistic likelihoods." As I read the *Acosta* opinion, an individual who fled his country to avoid mass executions might be eligible for both withholding of deportation *and* asylum, whether or not he presented evidence of the numerical reach of the persecution. See *Acosta,* Interim Decision No. 2986, at 18–25.[3] Nowhere does the Court consider whether the BIA's four-element interpretation of "well-founded" is unreasonable. Nor does the Court consider the BIA's view of the types of evidentiary presentations aliens generally make in asylum cases.

In sum, the words Congress has chosen—"well-founded" fear—are ambiguous. They contemplate some objective basis without specifying a particular evidentiary threshold. There is no reason to suppose this formulation is inconsistent with the analysis set forth in *Acosta.* The BIA has concluded that a fear is not "well-founded" unless the fear has an objective basis indicating that there is a "realistic likelihood" that persecution would occur. Based on the text of the Act alone, I cannot conclude that this conclusion is unreasonable.

## III

The Court bolsters its interpretation of the language of the Act by reference to three parts of the legislative history. A closer examination of these materials demonstrates that each of them is ambiguous. Nothing the Court relies on provides a positive basis for arguing that there is a material difference between the two standards.

---

[3] Of course, the applicant would have to meet all four elements of the well-founded fear standards. See *supra,* at 457 (quoting *Acosta,* Interim Decision No. 2986, at 22). Although these requirements restrict grants of relief in some cases, none of them rests on the mathematical considerations that the Court suggests govern current BIA practice. Moreover, the Court's exegesis of the "plain meaning" of the phrase "well-founded" in no way suggests that the BIA's four-part test is a misinterpretation of the statute.

462

## A

First, the Court cites legislative history indicating that Congress wished to preserve some existing standard when it placed the words "well-founded fear" in the Act. The Court concludes that the standard Congress intended to preserve was the BIA's practice under the old § 203(a)(7), 79 Stat. 913 (1965). That section authorized the Attorney General to grant conditional entry to aliens fleeing from Communist countries or the Middle East, so long as they established a "fear of persecution." The Court argues that Congress chose the words "well-founded fear" to "preserve" as an asylum standard the prior interpretation of the word "fear" in the standard for conditional entry.

In contrast, the United States argues that Congress chose the words "well-founded fear" to preserve the Attorney General's regulations governing applications for asylum by aliens in the United States.[4] These regulations were substantially in accord with the BIA's view, namely that there is no significant difference between the "well-founded fear" and "clear probability" standards. Compare 8 CFR §§ 108.3(a) and 236.3 (a)(2) (1980) (asylum) with 8 CFR § 242.17(c) (1980) (withholding of deportation). Common sense suggests that the United States has the better of this argument. It is more natural to speak of "preserving" an interpretation that had governed the same form of relief than one that had applied to a different form of relief.

Moreover, the legislative history makes it clear that Congress was referring to the regulations rather than to § 203(a)(7). The Senate Report states that the bill "im-

---

[4] Those regulations constituted this country's informal attempt to comply with the exhortation of the Convention Relating to the Status of Refugees to "facilitate the assimilation and naturalization," Art. 34, Jan. 31, 1967, [1968] 19 U.S.T. 6259, 6276, T.I.A.S. No. 6577, of persons who have a "well-founded fear of being persecuted," Art. 1(A)(2), *id.*, at 6261. All parties agree that the Convention's language was the ultimate source of the language Congress placed in the Act.

prov[es] and clarif[ies] the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed." S. Rep. No. 96–256, p. 9 (1979). As the Court recognizes, *ante*, at 435, n. 17, this statement unquestionably refers to the informal procedures for aliens in the United States, not the statutory procedures under § 203(a)(7).[5] Similarly, the House Report states that "the new definition does not create a new and expanded means of entry, but instead regularizes and *formalizes* the policies and practices that have been followed in recent years." H. R. Rep. No. 96–608, p. 10 (1979) (emphasis added). Congress hardly would have felt a need to "formalize" the statutory procedures under § 203(a)(7). Indeed, the House Report cites the Attorney General's regulations as the extant procedures to which it was referring. H. R. Rep., at 17.

In my view, the legislative history indicates that Congress' choice of the words "well-founded" fear as the standard of eligibility for asylum was intended to carry forward the practice of the Attorney General in adjudicating asylum applications. The Attorney General had concluded that the standard for asylum was substantially identical to the standard for withholding of deportation. His decision to interpret the language of § 208 in the same way is entirely reasonable.

### B

Second, the Court relies on materials interpreting the United Nations Protocol. *Ante*, at 437–440. For several reasons, I find these materials to be only marginally rele-

---

[5] The Court concludes that the Senate Report has no probative force because the Conference Committee adopted the House language rather than the Senate language. But the changes in language made by the Conference Committee do not help the Court's position. As I explain *infra* this page, the House Report indicates that the House bill also was intended to adopt the standards set forth in the regulations. Moreover, there is no suggestion in the Conference Report that this change in language affected the substantive standard. See *infra*, at 464–465.

vant. Both the President and the Senate thought that the Protocol was perfectly consistent with our country's immigration laws. See *INS* v. *Stevic*, 467 U. S. 407, 417 (1984) (citing legislative history). We should be reluctant to assume that our country has been violating the Protocol during the 20 years since its adoption. Moreover, as the Court recognizes, statements by the United Nations High Commissioner for Refugees have no binding force, because "'the determination of refugee status under the . . . Protocol . . . is incumbent upon the Contracting State.'" *Ante*, at 439, n. 22 (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 1(ii) (Geneva, 1979)).

In any event, the materials discussed by the Court shed little or no light on the question presented by this case. None of them states that the burden of proof for nonrefoulement under Article 33.1 of the United Nations Protocol of 1967—a remedy essentially identical to withholding of deportation under § 243(h) of the Act—is higher than the burden of proof for asylum under Article 34. The only thing the materials tend to establish is that a mathematical approach to the likelihood of persecution in asylum cases is arguably inconsistent with the sense of the drafters of the Protocol. The BIA has declined to adopt such an approach. See *supra*, at 457–459. It is simply irrelevant that this approach might be inconsistent with the views of commentators on the Protocol.

## C

Finally, the Court places great weight on the changes in the Act made by the Conference Committee. The Court notes that the Senate bill, S. 643, authorized the Attorney General to grant asylum if the applicant "is a refugee within the meaning of section 101(a)(42)(A) and his deportation or return would be prohibited under section 243(h) of this Act." S. Rep. No. 96–256, at 26. The Court conjectures that this language "indicates that the Senate recognized that

there is a difference between the 'well-founded fear' standard and the clear-probability standard. The enactment of the House bill rather than the Senate bill in turn demonstrates that Congress eventually refused to restrict eligibility for asylum only to aliens meeting the stricter standard." *Ante*, at 442 (footnote omitted).

Neither the premise of the Court nor its conclusion is justified. The language of the Senate bill does not demonstrate that the Senate recognized a difference between the two standards. The Senate just as easily could have included the language to ensure that the Attorney General held to his position that there was no difference between the standards. Moreover, there is no reason to believe that the changes made by the Conference Committee reflected a considered rejection of this portion of the Senate's definition of refugee. Rather, the Conference Committee Report demonstrates that the Conference thought both bills adopted the same general definition of refugee—the U. N. definition. See H. R. Conf. Rep. No. 96–781, p. 19 (1980). The differences the Conference saw between the bills related to treatment of refugees still in their homeland, and to refugees who have been "firmly resettled" in another country. See *ibid.*

In short, I see no reason to believe that the minor differences in wording between the Senate bill and the Act as passed reflect a rejection of the position that there is no significant difference between the two standards.[6] Thus, I place no weight on the Conference Committee's choice of the language of the House bill.

## IV

Even if I agreed with the Court's conclusion that there is a significant difference between the standards for asylum and

---

[6] This interpretation is supported by evidence that the House bill, like the Senate bill, was intended to preserve the Attorney General's regulations treating the two standards as substantially identical. See *supra*, at 463.

withholding of deportation, I would reverse the decision of the Court of Appeals and uphold the decision of the BIA *in this case.*[7] A careful reading of the decisions of the BIA and the Immigration Judge demonstrates that the BIA applied the lower asylum standard to this case.

Respondent's claim for asylum rested solely on testimony that her brother had experienced difficulties with the authorities in Nicaragua. The Immigration Judge rejected respondent's claim because he found "no evidence of any substance in the record other than her brother's claim to asylum." App. to Pet. for Cert. 27a. He further found:

> "None of the evidence indicates that the respondent would be persecuted for political beliefs, whatever they may be, or because she belongs to a particular social group. She has not proven that she or any other members of her family, other than her brother, has *[sic]* been detained, interrogated, arrested and imprisoned, tortured and convicted and sentenced by the regime presently in power in Nicaragua." *Ibid.*

The absence of such evidence was particularly probative, because many of the other members of respondent's family— her parents, two sisters, her brother's wife, and her broth-

---

[7] The Court contends that this question is not before us. *Ante,* at 448, n. 31. I find this suggestion quite strange. The Immigration and Naturalization Service asked the Court to determine "[w]hether an alien's burden of proving eligibility for asylum . . . is equivalent to his burden of proving eligibility for withholding of deportation." Pet. for Cert. (I). The question whether the two standards are equivalent "fairly includes," under this Court's Rule 21.1(a) the problem of defining the appropriate standard for asylum. And that question can only be answered on the facts of this case. The Court does not sit to answer hypothetical questions of statutory construction. Normally we resolve such questions only by examining the facts of the case before us. In this case, the Court affirms the Court of Appeals' decision that the BIA required an intolerably high burden of proof in this case. Yet, like the Court of Appeals, the Court examines neither the facts of the case before us nor the legal standard the BIA applied. In my view, Rule 21 does not contemplate this result.

er's two children—were still in Nicaragua and thus presumably subject to the persecution respondent feared.

On appeal, the BIA affirmed. It decided this case after the passage of the Act, but before its opinion in *Acosta*. At that time, the BIA was confronted with a number of conflicting decisions by Courts of Appeals as to the correct standard for evaluating asylum applications. The BIA noted three different formulations of the "well-founded fear" standard: the "clear probability" test, see *Rejaie* v. *INS*, 691 F. 2d 139 (CA3 1982); the "good reason" test, see *Stevic* v. *Sava*, 678 F. 2d 401 (CA2 1982), rev'd on other grounds, *INS* v. *Stevic*, 467 U. S. 407 (1984); and the "realistic likelihood" test the BIA had adopted in *Matter of Dunar*, 14 I. & N. Dec. 310 (1973). App. to Pet. for Cert. 21a. See *supra*, at 456–459 (discussing *Acosta*). Reviewing the evidence respondent had submitted to the Immigration Judge, the BIA concluded that respondent could not obtain relief under any of the standards. The BIA focused especially on the fact that respondent

> "has openly admitted that she herself has taken no actions against the Nicaraguan government. She admits that she has never been politically active. She testified that she never assisted her brother in any of his political activities. Moreover, she admits that she has never been singled out for persecution by the present government." App. to Pet. for Cert. 22a.[8]

Respondent filed a petition for review with the Court of Appeals for the Ninth Circuit. Without examining either the factual or legal basis for the BIA's decision, the court granted the petition, reversed the BIA's decision, and remanded the application to the BIA for further consideration.

---

[8] In terms of the four-element *Acosta* test for well-founded fear, respondent's claim would have failed both the first and the second elements. Respondent failed to show either that she "possesses a belief or characteristic the persecutor seeks to overcome" or that "the persecutor is already aware, or could easily become aware, that [she] possesses this belief or characteristic." *Acosta*, Interim Decision No. 2986, at 22.

767 F. 2d 1448 (1985). The sole basis articulated for this action was a conclusion that the BIA had applied the wrong legal standard. The Court of Appeals repeated its position that the standards for asylum and withholding of deportation are different. According to that court, an asylum applicant must "present 'specific facts' through objective evidence to prove either past persecution or *'good reason'* to fear future persecution." *Id.*, at 1453 (quoting *Carvajal-Munoz* v. *INS*, 743 F. 2d 562, 574 (CA7 1984)) (emphasis added). It then noted that the BIA had reached a different conclusion in *Acosta* and stated:

> "[T]he Board appears to feel that it is exempt from the holding of *Marbury* v. *Madison* . . . and not constrained by circuit court opinions. . . . [T]he Board applied its own construction of the applicant's burden of proof in an asylum case to the claims of both Cardoza-Fonseca and [her copetitioner]. It held that they were required to demonstrate a clear probability of persecution in order to be declared eligible for asylum." 767 F. 2d, at 1454 (citation omitted).

This statement is simply inconsistent with the BIA's opinion. As I have explained, the BIA acknowledged the conflicting decisions of the various Courts of Appeals and explicitly tested the application under three different standards. The least burdensome of these—the "good reason" standard—is identical to the court's statement quoted *supra* this page. The Court of Appeals completely ignored the words in which the BIA framed its decision. It failed to examine the factual findings on which the decision rested. At least in this case, it appears that the Court of Appeals, and not the BIA, has misunderstood the proper relation between courts and agencies. That court properly could have considered whether substantial evidence supported the BIA's conclusion that respondent failed to demonstrate a "good reason" to fear persecution, but it should not have assumed that

the BIA tested respondent's application by a higher standard than the BIA's own opinion reflects.

## V

In my view, the Court misconstrues the Act and misreads its legislative history.   Moreover, neither this Court nor the Court of Appeals has identified an error in the decision of the BIA in *this* case.   Neither court has examined the factual findings on which the decision rested, or the legal standard the BIA applied to these facts.   I would reverse the decision of the Court of Appeals.